FILED

04/02/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0078

DA 23-0078

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 67

STATE OF MONTANA,

     Plaintiff and Appellee,

  v.

MICHEL SCOTT DULANEY,

     Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Sanders, Cause No. DC-20-31
Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

     Colin M. Stephens, Stephens Brooke, P.C., Missoula, Montana

     For Appellee:

     Austin Knudsen, Montana Attorney General, Tammy K Plubell,
Assistant Attorney General, Helena, Montana

     Megan Hansen, Sanders County Attorney, Thorin Geist, Special
Deputy County Attorney, Helena, Montana

Submitted on Briefs:  January 8, 2025

Decided:  April 2, 2025

Filed:

_____
Clerk

Justice Katherine Bidegaray delivered the Opinion of the Court.

¶1      Michel Scott Dulaney appeals his December 2022 judgment and conviction in the Montana Twentieth Judicial District Court, Sanders County, on three counts of attempted deliberate homicide.  We address the following restated issues:

1.  *Did the District Court erroneously require the Defendant to admit that he acted purposely and knowingly to assert the defense of Justifiable Use of Force?*

2.  *Did the District Court abuse its discretion when it excluded the testimony of the Defendant's expert witness?*

3.  *Did the District Court erroneously deny the Defendant's post-verdict § 46-16-702, MCA, motion for a new trial or judgment of acquittal?*

We affirm.

**PROCEDURAL AND FACTUAL BACKGROUND**

¶2      On July 11, 2020, Sanders County Sheriff's deputies responded to a residential area near Heron, Montana, on report that a man had been shot by his neighbor.  Once there, deputies learned that the victim, Edgar Torrey, had been since removed from the scene by two witnesses, brothers David and Troy Clifton, who immediately left to seek emergency medical care.  Idaho Sheriff's deputies intercepted their vehicle and arranged for Torrey to be life-flighted to the hospital.  David and Troy told deputies that Torrey was shot during an altercation with Dulaney at his home, at which point the brothers returned fire and retrieved the injured Torrey.  When deputies questioned Dulaney, he initially explained that he had been inside his home "watching a movie," but later stated that Torrey was "charging down the hill" toward his house and the others were "shooting up [his] house with [his] family inside."  Dulaney's wife told police that she was lying in bed when she

2

suddenly heard yelling, saw Dulaney rush into the house to retrieve a gun, heard what sounded like Dulaney firing the gun, and then the house being shot. Based on the accounts of all involved, deputies arrested Dulaney.

¶3 In late July 2020, the State charged him by Information with three counts of felony assault with a weapon. The State later amended the charging information in December 2020 to include three counts of attempted deliberate homicide, a felony, in violation of §§ 45-5-102(1)(a) and 45-4-103(1), MCA, alleging that Dulaney "purposely or knowingly attempted to cause" Torrey, David, and Troy's deaths. At omnibus proceedings in December 2020, Dulaney noticed his intent to assert the defense of justifiable use of force. In May 2022, the State again amended the charging information, this time dismissing the three counts of assault with a weapon and charging Dulaney only for the offenses of attempted deliberate homicide.

¶4 In advance of the scheduled jury trial, the State first sought to preclude Dulaney from offering the testimony of Gary Marbut, a purported "expert concerning self-defense, use of force, firearm safety, and related topics."[1] The State asserted that Marbut's anticipated testimony regarding what Dulaney may have "reasonably believed" or whether his use of force was "justified" was impermissible opinion testimony, and his anticipated testimony that Torrey could have turned around in the amount of time it took Dulaney to fire his weapon, thus explaining how he was shot in the back, was not a fact in dispute, cumulative of the State's evidence, and in any event not a subject matter beyond common

---

[1] According to an article Marbut authored titled "*Shots in the Back—Are They 'Legal'?*," which Dulaney attached to his expert disclosure.

3

experience or understanding. Dulaney responded that Marbut would not testify regarding justification, but rather, to rebut the anticipated State argument that Dulaney's use of force was unreasonable because Torrey was in retreat when Dulaney shot him. Considering the State's promise that it would not argue Torrey's apparent retreat affected the reasonableness of Dulaney's use of force, and its determination that the expert's testimony would be cumulative of the State's evidence, the District Court granted the State's motion to exclude it.

¶5 The State also separately sought to preclude Dulaney from arguing a justification defense "in any capacity" unless he testified at trial. The State asserted that "a defendant who relies upon the defense of justifiable use of force concedes that he acted purposely or knowingly," and thus Dulaney could not assert the defense "unless he testifies at trial **and** unequivocally admits that he committed the offenses with which he has been charged." Dulaney answered that forcing a defendant "to admit to every element" of an offense as a prerequisite to asserting a justification defense "essentially eliminates" the State's burden to prove all elements of the offense beyond a reasonable doubt. While conceding that his justification defense would admit that he purposely and knowingly "discharged his firearm," Dulaney argued that he nonetheless could and would argue that he did not have the requisite mental state for attempted deliberate homicide.

¶6 At a final pretrial conference in June 2022, the District Court considered the self-defense issue. There, the court granted the State's motion as follows:

> I'm going to grant the motion prohibiting the defendant from arguing the affirmative defense of justifiable use of force *in any capacity unless he testifies at trial*. I will [also] . . . prohibit[] the defendant from arguing the

4

affirmative defense . . . at trial . . . dependent on the facts that are elicited at trial. And I might reverse this if the facts show something different than what the parties have argued in their briefs. . . . [T]here could be something that occurs during the course of the . . . State's case in chief, that might cause me to reverse . . . what I just said. But for the time being, I'm going to prohibit the defendant from arguing the affirmative defense of justifiable use of force or . . . use of force in defense of an occupied structure.

And this will be primarily something to bear in mind during voir dire and during your opening statements. But if the evidence flows in some other way in the State's case in chief, I may allow you to get into it [in] . . . the defense case, and certainly final arguments and the instructions. But this is my ruling for the time being.

(Emphasis added.) When later pressed by defense counsel for clarification as to how Dulaney could effectively raise the justification defense during the State's case-in-chief, the court answered:

I think you can cross-examine on some of those . . . facts without necessarily saying this is what we're relying on. . . . [Y]ou could cross-examine the victim, the two guys that were with him, any witnesses that might have been there, any officers that were there. And you could lay a lot of groundwork that might . . . be useful later in a self-defense argument.

But I think until your guy takes the stand and testifies – in effect, *he doesn't have to get up and prove the State's case for them. The State's got to do that.* If they can't prove the elements of the crimes in their case in chief, then they're subject to a dismissal by the court. You don't have to do anything. You won. [S]o *the State's got to prove its case.* You don't have to get on the stand before the trial starts *and admit the elements of the offense.* The State *needs to prove them.*

.  .  .

But assuming the State is successful at putting on evidence that supports all the elements – then, . . . you got to make a choice: Either we're not going to testify at all or if we are going to testify and rely on justifiable use of force, your guy's gonna have to get up and say, *Yeah, I shot him and I felt that there was a – I understand that when you shoot somebody, it's reasonably foreseeable that it might cause death or serious bodily injury.*

5

I think if you look at the definition of knowingly, a high likelihood a certain result's gonna occur. He says that, *Yeah, there's a high likelihood if I shoot somebody, I might kill them.* And . . . you keep using the word 'intent' in your argument [but that] isn't a word that we use in Montana criminal law. The words we use for state of mind are purpose or knowledge. And I think *knowledge is the one that fits . . . this most closely.* So that's how it would go.

(Emphasis added.) The State later agreed that a defendant's affirmative showing of justifiable use of force would trigger a burden-shift requiring it to disprove justification, but only once the defendant "admit[s] [he] acted purposely or knowingly [as to] all of the elements of the offense of attempted deliberate homicide."

¶7 Dulaney's jury trial lasted three days. Torrey testified for the State that he and Dulaney had been neighbors[2] for approximately five years, but their relationship began to deteriorate when Dulaney dumped construction debris and pallets on Torrey's property and made an upsetting comment to his six-year-old daughter. Torrey testified that the day of the shooting, after celebrating his daughter's birthday at a nearby stock pond with friends and family, including the Clifton brothers, he returned home and began drinking and shooting clay pigeons with David and Troy. At approximately 6:30 p.m., Torrey texted Dulaney, voicing his displeasure with Dulaney's children not being allowed to attend the birthday celebration, which upset Torrey's kids. Dulaney responded to "go away" and leave his family alone. Torrey answered that he was "not going anywhere." Torrey testified that afterward, he and the Clifton brothers rode dirt bikes and an ATV along a community trail system to a nearby fishing access. At some point, David crashed his bike

---

[2] Both men were tenants on an approximately 16-acre parcel owned by a common landlord.

on cut logs lain across the trail where it passed between Torrey and Dulaney's houses. On his way home, Torrey testified that he took a route that "circle[d] around" between Dulaney's house and his, "moving pretty quick." Once home, Torrey was "pretty upset" about the logs in the trail and, with the Clifton brothers, began dragging pallets 40-50 yards down the driveway leading to Dulaney's home to throw them in his yard. Dulaney's house sat on the river bottom, and where the driveway switched-back, there was a steep hill between it and the house. As he threw a pallet over the bank, Torrey saw Dulaney outside, standing by his truck.

¶8     Torrey testified that the two men then began arguing, and that he challenged Dulaney to a fight. Upon seeing Dulaney reaching into his truck, Torrey asked, "What, are you gonna get a gun or something or shoot me?"[3]  Torrey, unarmed, said that he then took a few steps down from the driveway onto the hill, later characterized as "posturing," at which point Dulaney ran into his house. Thinking that there was then "nothing to do," Torrey "turned around and started back up the hill." Immediately, he heard gunshots and was shot in the back. He remembered tumbling down the hill landing face down. A bullet severed his spinal column, paralyzing him, and punctured his lung.

---

[3] Dash cam audio from Troy Clifton's pickup truck captured someone saying, "Shoot me! Shoot me!" immediately before the first shots were fired. There was mixed testimony regarding who said it. Torrey denied that he did, and denied hearing it, but acknowledged that it was on the dash cam audio. David testified that he "believe[d] he said it." Troy also testified that he did not remember anyone saying those words but "believe[d]" it was his brother's voice on the recording. Dulaney testified that after he came outside onto his porch with his pistol, Torrey "yelled, 'Are you gonna shoot me? Shoot me,'" as he was "coming down the hill" and "looking at me."

7

¶9     David Clifton testified for the State and largely corroborated Torrey's version of events.  After riding dirt bikes, David, Troy, and Torrey began moving the pallets down the driveway to Dulaney's house.  David testified that after dropping a pallet, he saw Dulaney and Torrey begin arguing while Torrey was standing just below the driveway on the hill.  He said that Dulaney went into the passenger side of his truck, shut the door, and then went into his house.  David testified the men had agreed to go and "started walking away," when he "turned around" and saw Dulaney "pointing" a gun at Torrey and begin shooting.[4]  David, open-carrying a handgun, immediately "started shooting back."  He testified that bullets were "whizzing over" his head.  David's brother, Troy, was also returning fire from behind a nearby tree.  Seeing Torrey at the bottom of the hill "in the brush," David rushed to him, told him to get up, and when Torrey could not, dragged him behind cover.  By that time, Troy came down the driveway in his pickup and the two men "loaded him up and took off."  When asked why he shot at Dulaney and his house, David answered, "So we didn't get shot and get killed."

¶10    Troy Clifton testified for the State, also generally corroborating Torrey and David's accounts.  He said that he and his brother helped Torrey drag pallets down toward Dulaney's home, and as they got there, Dulaney came out of his house and he and Torrey "started yelling back and forth" and challenging each other to a fight.  Troy testified that when Dulaney went into his house, the men "turned to start walking away."  However,

---

[4] On cross-examination, David walked-back that testimony and admitted that he did not actually see Dulaney come out of his house with the gun, and was not looking at Dulaney when he fired at Torrey, but rather turned when he heard gunshots.

8

within "a few seconds," Troy heard gun shots, turned and saw Torrey "rolling down the hill," and "returned fire" with a pistol he also open-carried. He testified unequivocally that Dulaney shot first. During the exchange, Troy heard a bullet "hit the tree right next to" where he stood. At some point, he saw that his brother had run down the driveway to retrieve Torrey. Troy testified that he then drove his pickup down to retrieve them both. The State also introduced dash cam footage from Troy's truck capturing some of the shoot-out. When asked why he shot at Dulaney's house, Troy answered that Dulaney was "reaching his hand out the door" and shooting at them, and he wanted to push him "back into the house."

¶11     Dulaney's then-wife also testified for the State that while Torrey and the Clifton brothers were shooting targets that afternoon, Dulaney became angry and fired several rounds from his rifle off the porch of his house. She said he also became angry while the men were riding dirt bikes and made her help him place a cattle gate across a section of road. Later, while watching television with her baby in the bedroom, she heard arguing outside, after which Dulaney, appearing very angry, came into the bedroom, retrieved a pistol, and ran outside. Dulaney's wife testified unequivocally that Dulaney shot first.

¶12     The responding Sheriff's deputy also testified for the State. He explained that, upon initial contact, Dulaney was "very excited" and stated that the three men had been "harassing" him all day and he showed the deputy a spot in his driveway where an ATV had turned up some gravel. He said Dulaney then showed him the damage to his home, where he had been "watching a movie" when the shooting began. When the deputy asked Dulaney where Torrey had been shot, he declined to answer any more questions. Among

9

other State witnesses, the landlord testified that Dulaney had once said he was not afraid of Torrey, would "kick his ass," and would shoot him if he came onto his property.

¶13 At recess after the State rested its case-in-chief, the defense moved to dismiss for lack of evidence sufficient to prove the mental state element for attempted deliberate homicide, i.e., that Dulaney acted toward purposely or knowingly causing Torrey, David, or Troy's deaths. Conceding that there was testimony that Dulaney had "direct[ed] the gunfire" at all three men, the defense argued that there was no evidence upon which a jury could find beyond a reasonable doubt that "he was purposeful and knowing in trying to end their lives." In response, the prosecutor noted the procedural timing of the defense motion in context of the court's pretrial ruling and argued that Dulaney would eventually have to "admit to all of the elements for attempted deliberate homicide" in order to receive instruction on justifiable use of force, and in any event, it had "more than met [its] burden" of proof. The District Court, concluding that there was sufficient evidence to support a jury inference regarding the elements of the offense, denied Dulaney's motion.

¶14 At a separate conference the court considered the State's objection to Dulaney testifying regarding his knowledge of Torrey's prior violent behavior without first laying foundation by "admit[ting] to the charges against him . . . that he attempted, purposely or knowingly, to kill" Torrey. The court decided:

> Well, I'm not sure I agree with that . . . bare of statement. I think that it's sufficient if he purposely or knowingly *used deadly force* that he knew . . . there was a high likelihood that what he was doing would cause serious bodily injury or death. . . . I don't think he has to say, . . . it was my *purpose* to *kill him*, period. I was using deadly force [and] . . . I understand if I shoot at somebody there's a high likelihood it's gonna cause serious bodily injury or death. I think that's enough. . . . He needs to take the stand

10

[and] . . . admit that he *attempted to shoot* . . . Edgar Torrey, David Clifton, and Troy Clifton, and that he either *acted* purposely or knowingly. [(Emphasis added.)]

¶15 Per the court's pretrial ruling, Dulaney testified in his defense. He explained that leading up to the July 11, 2020 shoot-out, his once-friendly relationship with Torrey had soured. Shortly before the incident, Dulaney said when he saw Torrey's young daughter on his property, he sternly told her to go home. According to Dulaney, Torrey afterward left him a threatening voicemail. He also described their ongoing dispute over the construction debris and pallets, and testified that at one point, Torrey approached him and threatened to punch him in the face. Dulaney testified that he was previously severely injured in fistfights in his past, and perceived Torrey as a "very strong, younger man."

¶16 Dulaney testified that on the day of the altercation, his wife and five of his children were home doing various chores. He heard the men shooting guns that afternoon and saw Torrey ride through his property on an ATV. He interpreted the texts Torrey sent him that evening as threats. "[F]ed up" with the dirt bike/ATV through-traffic, Dulaney was trying to erect the cattle gate to block the road and looking for tools in his truck when Torrey and the Clifton brothers came down his driveway with the pallets. The men began yelling at each other. Dulaney testified that as Torrey "came off the hill, down towards [his] house," he "waited until [Torrey] got down to about mid hill" and then ran into his house to retrieve a pistol. Dulaney said he did so because "there was no way [he] could allow that threat into [his] home around [his] children." When he came back out, Torrey was "still coming."

¶17 Dulaney admitted that he fired five shots at Torrey as he was "coming down the hill." He testified that he did so because he felt that he was in danger and was afraid that

11

Torrey was going to "beat [him] into the ground" or "maybe even kill" him. He said that upon firing, he saw Torrey "spin around" and "fall to the ground." Dulaney denied that he shot Torrey in the back, but testified on cross-examination that, after the first shot, Torrey "spun . . . like he was trying to duck and get out of the way," and when Torrey "spun around, . . . he may have got hit in the back." When asked if when he "shot at" Torrey he was "trying to kill him," Dulaney answered, "No," and that he was instead "trying to stop the threat." He testified that he also shot at David and Troy for the same reason: after he fired at Torrey, "bullets started raining down on [his] home from the hillside above" and he "felt like, again, [his] life was in danger." Further, because David and Troy were shooting at his house, with his children inside, he "thought [his] family was going to die." He said that he believed all three were armed because they "always had a pistol" and denied that he would have shot at Torrey if he did not feel threatened or shot at the Clifton brothers if they had not shot at him first. He conceded on cross-examination, however, that "one of the rules" of firearms is to "never point a weapon at something that you're not intending on destroying." Dulaney admitted that after he was arrested, out of anger and frustration, he said he hoped Torrey died from his injuries.

¶18 Following deliberations, the jury found Dulaney guilty of all three counts of attempted deliberate homicide. He filed a post-verdict motion pursuant to § 46-16-702, MCA, which the District Court denied. Dulaney was later sentenced to a net 45-year term of imprisonment and now timely appeals.

**STANDARD OF REVIEW**

¶19    "A district court's ruling on a motion in limine is an evidentiary ruling and therefore reviewed for an abuse of discretion." *State v. Thomas*, 2020 MT 281, ¶ 13, 402 Mont. 62, 476 P.3d 26.  A court abuses its discretion when it acts arbitrarily without conscientious judgment or exceeds the bounds of reason resulting in a substantial injustice.  *State v. Larson*, 2004 MT 345, ¶ 34, 324 Mont. 310, 103 P.3d 524.  "Notwithstanding this deferential standard, however, judicial discretion must be guided by the rules and principles of law," and therefore, where the court's evidentiary ruling is based on its interpretation of law, our review is de novo for correctness.  *State v. Skinner*, 2007 MT 175, ¶ 15, 338 Mont. 197, 163 P.3d 399.

¶20    "Our standard of review of a trial court's ruling on a motion for a new trial depends on the basis of the motion."  *State v. Bomar*, 2008 MT 91, ¶ 15, 342 Mont. 281, 182 P.3d 47.  Where the motion is based on sufficiency of the evidence, we review the grant or denial of the motion de novo.  *State v. Mackrill*, 2008 MT 297, ¶ 19, 345 Mont. 469, 191 P.3d 451.

**DISCUSSION**

¶21    1. *Did the District Court erroneously require the Defendant to admit that he acted purposely and knowingly to assert the defense of Justifiable Use of Force?*

¶22    Montana law provides for multiple circumstances where "use of force" against another person is "justified."  Sections 45-3-102 through -108, MCA.  As pertinent here, § 45-3-102, MCA, provides:

>      A person is justified in the use of force or threat to use force against another
>      when and to the extent that the person reasonably believes that the conduct

13

is necessary for self-defense or the defense of another against the other person's imminent use of unlawful force.

The "use of force" must be of "a degree commensurate with the threat of harm." *State v. Stone*, 266 Mont. 345, 347, 880 P.2d 1296, 1298 (1994). Section 45-3-102, MCA, also more narrowly provides that:

[T]he person is justified in the use of force likely to cause death or serious bodily harm only if the person reasonably believes that the force is necessary to prevent imminent death or serious bodily harm to the person or another or to prevent the commission of a forcible felony.

Section 45-2-101(1)(a), MCA, defines "[f]orce likely to cause death or serious bodily harm," often called deadly force, as "the firing of a firearm in the direction of a person, even though no purpose exists to kill or inflict serious bodily harm."

¶23 United States and Montana constitutional due process requires that the State prove every factual element of a charged offense beyond a reasonable doubt. *State v. Mills*, 2018 MT 254, ¶ 24, 393 Mont. 121, 428 P.3d 834 (citing *In re Winship*, 397 U.S. 358, 361-64, 90 S. Ct. 1068, 1071-73 (1970)). Justifiable use of force "provides a complete affirmative defense" to the crime charged if the defendant successfully proves the elements of justification, entitling the defendant to acquittal. *See State v. Polak*, 2018 MT 174, ¶ 26, 392 Mont. 90, 422 P.3d 112; *State v. Courville*, 2002 MT 330, ¶ 36, 313 Mont. 218, 61 P.3d 749; § 45-3-115, MCA. A defendant who asserts the defense of justifiable use of force has the initial "burden of producing evidence on the issues sufficient to raise a reasonable doubt of his guilt." *Polak*, ¶ 26 (citing *State v. Miller*, 1998 MT 177, ¶ 23, 290 Mont. 97, 966 P.2d 721); *State v. Longstreth*, 1999 MT 204, ¶ 22, 295 Mont. 457, 984 P.2d 157, *abrogated on other grounds by* § 46-16-131, MCA (2009); *State v. Daniels*, 2011 MT 278, ¶¶ 13-16,

14

362 Mont. 426, 265 P.3d 623 (even though defendant's burden is to produce evidence, but not affirmatively prove justification, justifiable use of force "still operates as an affirmative defense" (citing § 26-1-401, MCA)). The defendant does so by offering evidence that the defendant: (1) was not the first aggressor; (2) reasonably believed he was in imminent danger of unlawful harm; and (3) used reasonable force necessary for self-defense. *Polak*, ¶ 23; §§ 45-3-102 through -105, MCA. In turn, once a defendant has offered evidence of justification, the State has an additional responsive burden to prove beyond a reasonable doubt the defendant's actions were not justified. *State v. Fredericks*, 2024 MT 226, ¶ 14, 418 Mont. 220, 557 P.3d 32; *State v. Erickson*, 2014 MT 304, ¶ 25, 377 Mont. 84, 338 P.3d 598 (burden of proof shifts to the State to prove the absence of justification).[5] Ultimately, "[w]hether a defendant meets the requirements necessary to support [a] theory of self-defense is a question of fact for the jury." *Miller*, ¶¶ 24-25, 28; *Courville* ¶¶ 39-40.

¶24 To assert a defense of justifiable use of force, the defendant concedes that the "use of force" was a voluntary act. *See* § 45-2-202, MCA (a "material element of every offense is a voluntary act"); *compare* § 45-2-101(33), MCA (an "involuntary act" is "a bodily movement that otherwise is not a product of the effort or determination of the actor"). Likewise, with respect to the "conduct" constituting the charged offense, the defendant also effectively concedes that the "use of force" was purposeful and knowing. *See* § 45-2-101(15), (35), (65), MCA (defining conduct and conduct-based knowingly and

---

[5] *See also Daniels*, ¶¶ 13-16 (explaining that § 46-16-131, MCA (2009) (respective evidentiary burdens for justification defense), abrogated prior use-of-force cases to the extent they held defendant had the burden of proof on self-defense and State not required to prove absence of justification beyond a reasonable doubt once defendant put it at issue).

15

purposely mental states). *Accord State v. Nick*, 2009 MT 174, ¶ 13, 350 Mont. 533, 208 P.3d 864 (citing *People v. Joyner*, 278 N.E.2d 756, 760 (Ill. 1972) ("[b]y its very nature," self-defense "relates to knowingly and intentionally using force to deter another" and not to an accident)); *State v. R.S.A.*, 2015 MT 202, ¶¶ 31-37, 380 Mont. 118, 357 P.3d 899 (where defendant "essentially den[ied] he had used any force during the confrontation," he was not entitled to a self-defense instruction, or instruction on the State's responsive burden, until he "admitted to stabbing, punching, and/or kicking his pursuers"; testimony elicited on cross-examination was "insufficient to lay the foundation" for his defense). We have repeatedly recognized that a defendant "who relies upon the defense of justifiable use of force concedes that he acted purposely and knowingly." *Nick*, ¶ 13; *State v. St. Marks*, 2020 MT 170, ¶ 20, 400 Mont. 334, 467 P.3d 550; *State v. Nicholls*, 200 Mont. 144, 150, 649 P.2d 1346, 1350 (1982) ("[a]n affirmative defense is one that admits the doing of the act charged, but seeks to justify, excuse or mitigate it"); *State v. Sunday*, 187 Mont. 292, 307, 609 P.2d 1188, 1197 (1980) ("self-defense admits a purposeful act, but claims the purposeful act was justified"); *State v. Houle*, 1998 MT 235, ¶¶ 14-16, 391 Mont. 95, 966 P.2d 147. This broad statement has caused confusion regarding the parties' burdens when justifiable of force is at issue.

¶25 A defendant's concession that the "use of force" was knowing and purposeful is not an admission that the defendant caused and had the requisite mental state to cause the result, if any, constituting a particular offense. *See* § 45-2-101(65), (35), MCA (defining result-based knowingly and purposely mental states). Even a defendant who uses "force *likely to cause* death," such as by firing a gun "in the direction of a person," does not admit

awareness that it was highly probable that the use of force *would cause* death, or the "*purpose . . . to kill.*"  Sections 45-2-101(1)(a), 45-2-101(35), (65), MCA (emphasis added).[6]

¶26    True, there will be cases where the facts offered in support of a defendant's self-defense theory also support an inference that the defendant's conduct caused the specific criminal result or that he had the requisite mental state to cause that result.  *See State v. Rothacher*, 272 Mont. 303, 312, 901 P.2d 82, 88 (1995) ("[i]n many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not intend to cause injury" (citation omitted)); *State v. Christensen*, 2020 MT 237, ¶ 126, 401 Mont. 247, 472 P.3d 622 (citing § 45-2-103(3), MCA)).  However, the law does not *require* a defendant to admit purposely or knowingly causing the result constituting the offense to assert a justification defense.[7]  In fact, requiring a defendant to admit guilt to assert a justifiable use of force defense is incompatible with the constitutional presumption of innocence and requirement that the State prove every element of a criminal offense beyond a reasonable doubt.  Requiring a

---

[6] *Accord State v. Lambert*, 280 Mont. 231, 237, 929 P.2d 846, 850 (1996) ("to prove that a defendant was aware of his conduct is one thing; to prove that he was aware of the high probability of the risks posed by his conduct is quite another").

[7] *See, e.g.*, *State v. Sattler*, 1998 MT 57, ¶¶ 55-58, 288 Mont. 79, 956 P.2d 54 (defendant "admitted inflicting the blows which killed" the victim, and though it was "undisputed" that the violent blows caused victim's death, testified that he "did not intend to kill" him; jury could infer from the evidence presented that defendant "purposely or knowingly caused [the victim's] death beyond a reasonable doubt"); *Houle*, ¶¶ 14-16 (defendant "concede[d] in part" that he "purposely and knowingly [struck] the victim," but also testified that he did "not intend to seriously injure" him; defendant's testimony, in addition to "substantial testimony that [he] was the aggressor," could have supported a jury inference "that his conduct was purposeful" and he "was aware that any punch to [the] face would cause serious harm").

17

defendant to admit guilt would also obviate his burden to produce evidence sufficient "to raise a *reasonable doubt* of his *guilt*." *See Polak*, ¶ 26 (citing *Miller*, ¶ 23 (emphasis added)); *Longstreth*, ¶ 22; *State v. Sattler*, 1998 MT 57, ¶¶ 55-58, 288 Mont. 79, 956 P.2d 54; *Daniels*, ¶¶ 13-16. A justifiable use of force defense therefore does not relieve the State of its burden to prove every element of a charged offense, including the requisite mental state, beyond a reasonable doubt.[8]

¶27 Here, based on the events in July 2020, the State ultimately charged Dulaney with three counts of attempted deliberate homicide. Section 45-4-103(1), MCA, provides that

> a person commits the offense of attempt when, with the purpose to commit a specific offense, the person does any act toward the commission of the offense.

Attempt is an inchoate offense, meaning the intended result of the crime was not actually achieved. *See State v. Rains*, 53 Mont. 424, 426, 164 P. 540, 541 (1917) ("attempt is an intended apparent unfinished crime"); *accord State v. Marfuta*, 2024 MT 245, ¶ 37, 418 Mont. 353, 557 P.3d 1260 (noting that the result for the offense of attempted deliberate homicide, i.e., "causing [the] death of another," "was never completed").[9] Culpability for

---

[8] Accordingly, we limit our statement in dicta in *State v. German*, 2001 MT 156, 306 Mont. 92, 30 P.3d 360, that a justifiable use of force defense "essentially admits the elements of the charged offense, including mental state," to the particular facts and circumstances of that case, i.e., to where the defendant admitted it was his conscious object to shoot the victim. *German*, ¶¶ 2, 7, 12-13, 20, 23 (affirming district court denial of the defendant's proposed negligent homicide instruction as a lesser-included offense of deliberate homicide where the defendant asserted a justifiable use of force defense and testified that he "consciously decided to shoot" the victim twice at close range with a sawed-off shotgun (citing *State v. Martinez*, 1998 MT 265, ¶ 15, 291 Mont. 265, 968 P.2d 705)).

[9] *See also* § 94-4711, RCM (1947) (precursor to § 45-4-103, MCA) ("[a]n act done with the intent to commit a crime, and tending but failing to effect its commission, is an attempt to commit that crime").

18

attempt therefore arises when one acts with the purpose to accomplish the result constituting the underlying offense. *See State v. Colburn*, 2016 MT 246, ¶ 11, 385 Mont. 100, 386 P.3d 561; *State v. Ribera*, 183 Mont. 1, 11, 597 P.2d 1164, 1170 (1979) (the act "must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation" (citing *Rains*, 53 Mont. at 426, 164 P. at 541 ("there must be at least some appreciable fragment of the crime committed"))). *Compare State v. Boyd*, 2021 MT 323, ¶¶ 14-24, 407 Mont. 1, 501 P.3d 409 ("[n]ot all acts toward the commission of a crime are sufficient for an attempt conviction").

¶28    A person who "purposely or knowingly causes the death of another human being" "commits the offense of deliberate homicide." Section 45-5-102(1)(a), MCA. A person is therefore criminally liable for deliberate homicide if "aware that it is highly probable" the person's conduct will cause death, or "if it is the person's conscious object" to cause death. Section 45-5-101(35), (65), MCA (result-based knowingly and purposely mental states).[10] The mental state required for deliberate homicide, however, does not require proof of "a specific purpose" to cause death, *State v. Weinberger*, 204 Mont. 278, 289-90, 665 P.2d 202, 208-09 (1983), and "can be established if the result involves the same or similar kind of harm or injury as that which is contemplated by the defendant, even if the degree of

---

[10] *See also State v. Weinberger*, 204 Mont. 278, 286-87, 665 P.2d 202, 207 (1983) (for deliberate homicide, "the requisite mental state attaches to the result"); *State v. McKenzie*, 177 Mont. 280, 327-28, 581 P.2d 1205, 1232 (1978) (elements of deliberate homicide are "causing the death of another human being with the knowledge that you are causing or with the purpose to cause the death of that human being"); *State v. Ilk*, 2018 MT 186, ¶ 19, 392 Mont. 201, 422 P.3d 1219 (citing *State v. Rosling*, 2008 MT 62, ¶ 37, 342 Mont. 1, 180 P.3d 1102); *Miller*, ¶ 22 (citing § 45-5-102, MCA, Compilers' Comments).

injury actually caused was not contemplated." *State v. Dubois*, 2006 MT 89, ¶ 37, 332 Mont. 44, 134 P.3d 82; § 45-2-201(2)(b), MCA; *State v. VanDyken*, 242 Mont. 415, 434, 791 P.2d 1350, 1362 (1990) ("[i]t is no longer necessary to prove specific intent as an element of the crime unless the statute defining the offense requires as an element thereof specific purpose").

¶29 Conversely, the offense of attempt does require proof of a specific purpose: the person must act "with the purpose to commit a specific offense." Section 45-4-103(1), MCA.[11] Therefore, a person who acts toward purposely or knowingly causing the death of another human being, with the purpose to accomplish that result, commits the offense of attempted deliberate homicide. *Marfuta*, ¶ 38.[12] Accordingly, we have recognized that attempted deliberate homicide is a "result-based crime" requiring "a result-based mental state instruction." *State v. Ilk*, 2018 MT 186, ¶¶ 18-20, 392 Mont. 201, 422 P.3d 1219; *Marfuta*, ¶ 38.

¶30 Prior to trial and by citation to *St. Marks*, the State sought to prohibit Dulaney from asserting a justifiable use of force defense unless he testified and "unequivocally

---

[11] *See also State v. Howard*, 195 Mont. 400, 406-07, 637 P.2d 15, 18-19 (1981) (recognizing other "specific intent" crimes).

[12] *See also State v. Sellner*, 286 Mont. 397, 401, 951 P.2d 996, 998 (1997) ("[a]ttempted deliberate homicide requires proof that the defendant had the purpose to cause the death of another human being and acted toward purposely or knowingly causing the death of another human being"); *State v. Lake*, 2022 MT 28, ¶ 29, 407 Mont. 350, 503 P.3d 274 (State has the "initial burden of proving [defendant] purposely committed an act toward purposely or knowingly causing [the victim] to die"); *accord St. Marks*, ¶ 19; *State v. Schmalz*, 1998 MT 210, ¶ 20, 290 Mont. 420, 964 P.2d 763; *State v. Martin*, 2001 MT 83, ¶¶ 16-17, 26, 305 Mont. 123, 23 P.3d 216; *State v. Cowan*, 260 Mont. 510, 512-15, 861 Mont. 884, 885-87 (1993); *State v. Gone*, 179 Mont. 271, 289, 587 P.2d 1291, 1296 (1978); *State v. Howard*, 195 Mont. 400, 405, 637 P.2d 15, 18 (1981).

admit[ted]" that he "committed" the charged offenses. On appeal, the State asserts that the District Court correctly concluded that Dulaney had to "concede that he acted with purpose or knowledge," but backs off its prior categorical assertions, arguing instead that the District Court did not actually require Dulaney to "admit that he intended to kill" Torrey, David, or Troy in order to assert his justification defense.[13]

¶31     In *St. Marks*, on appeal of a conviction for attempted deliberate homicide, we considered the defendant's argument that the district court committed plain error in instructing the jury on § 45-2-201(2), MCA, "causation of an alternate result." *St. Marks*, ¶¶ 9, 12, 16-17, 19. We first noted that the instruction, which provided for a jury finding that a defendant had the requisite mental state to "cause[] a particular result," even if he or she denied intending to cause that particular result, was "inappropriate to the charge" because "*causation* of a particular result was never contested." *St. Marks*, ¶¶ 19, 21. First, the defendant "conceded that he had purposely caused injuries to [the victim] sufficient to cause his death." *St. Marks*, ¶¶ 8, 19 (defendant testified that he "reached up" and stabbed the victim in the chest with a kitchen knife, and when it "did not even seem [to] affect[] him, . . . thrust the knife a couple times" more). Second, the State only argued that the defendant "intended to kill" the victim, and never tried to prove that he "intended to cause

___

[13] In fact, during trial and out of the presence of the jury, the State acknowledged that its burden was "to prove [Dulaney] acted with knowledge or purpose," and it thus elicited testimony from the responding Sheriff's deputy regarding Dulaney's initial reactions and statements to law enforcement for the purpose of establishing his "mental state," i.e., "that he knew he was acting purposely or knowingly because he was mad." The State's principal argument in closing was that Dulaney's anger was evidence that he acted purposely or knowingly to cause Torrey, David, and Troy's deaths.

21

any other result." *St. Marks*, ¶¶ 21-22 (State argued to jury that "stabbing [the victim] in the chest three times with a nine inch blade" proved that he "did so with the purpose to commit the offense of deliberate homicide" because "what else are you planning if you are lunging a knife into someone's chest three times?"). Citing *Ilk*, we noted that a justifiable use of force defense concedes purposeful and knowing conduct, but clarified that, in context of "an inchoate offense, such as attempt," an individual asserting a justification defense "could concede that he acted purposely and knowingly, while still contending that his purpose was not to attempt the commission of a 'specific offense,' such as homicide." *St. Marks*, ¶¶ 20-22 (citing *Ilk*, ¶¶ 4, 6, 10, 13, 17, 25).[14] Concluding that the defendant had made no such argument, we declined to review the "inapplicable instruction" for plain error. *St. Marks*, ¶¶ 20-22.

¶32 Given the unique intersection of the specific intent, result-based offense of attempted deliberate homicide and the defense of justifiable use of force recognized in *St. Marks*, it is possible for a defendant to concede acting purposely and knowingly as to the conduct, i.e., "use of force" against a person, but still deny that the conduct was intended as an act toward purposely or knowingly causing that person's death.[15]

---

[14] We foreshadowed *St. Marks* in *Ilk*, where we held that the district court erroneously instructed the jury only on the conduct-based definitions of purposely and knowingly, when the charged offense—attempted deliberate homicide—called for a result-based mental state instruction. *Ilk*, ¶¶ 19-20. We nonetheless found the instructional error harmless because the defendant had conceded his conduct in asserting a justifiable use of force defense, and "did not place a result-based mental state at issue, that is, he did not contend that he acted knowingly or purposely with regard to his conduct, but not with regard to the result of his conduct." *Ilk*, ¶¶ 21-26.

[15] *See St. Marks*, ¶ 22 (justification defense does not "necessarily preclude[], in every case, an argument that the requisite intent was not present when the crime charged is an inchoate offense, such as attempt"); *Lake*, ¶ 29; *Ilk*, ¶¶ 21-26.

¶33    Here, from start to finish, Dulaney presented exactly such a defense.  During voir dire, his counsel questioned potential jurors regarding the reasonableness of a person's fear of "getting beat up in a fist fight"; how they felt "about someone invading the privacy of [their] home . . . uninvited" and especially if their children were there; and if any felt "particularly protective of their children."  In his opening statement, defense counsel described Torrey, David, and Troy's "provocative" conduct that day and Torrey's continued, persistent approach down the hill toward Dulaney with his "two buddies backing him up, . . . both strapped [and] ready to go."  On cross-examination, defense counsel elicited testimony from Torrey that even when he thought Dulaney was reaching for a gun in his truck, he nonetheless "started down the hill" toward him, effectively "[a]ccepting a challenge to a fight."  He further testified on cross that he did not believe Dulaney's texts that evening were meant to provoke or draw him into a fight, but instead, admitted that *he* intended dragging the pallets down to Dulaney's house to antagonize and provoke *him*.  Counsel elicited testimony on cross-examination of the investigating Sheriff's deputy regarding the "tactical advantage" of being in an elevated position shooting down on a target, and of three-on-one numbers when "faced with a life-and-death situation."  Cross-examination also established it was possible someone "in an excited state" could be experiencing "an episode where they thought their life might be in danger."  The deputy further testified on cross that where he found the blood stain evidence near the bottom of the hill, there was "no path" indicating a fall from the driveway down the hill to that spot, the logical inference being that Torrey was nearly at Dulaney's house when shot.  Dulaney's landlord testified on cross-examination that Torrey previously threatened to

23

"kick [Dulaney's] ass" and agreed their acrimony "was a two-way street." The landlord further stated that Torrey believed what Dulaney said to Torrey's daughter had "crossed the line," so Torrey "was going to go confront" Dulaney "with his fists."

¶34 Importantly, over the State's objection that it would violate the court's pretrial ruling prohibiting Dulaney from raising self-defense prior to testifying, the District Court permitted cross-examination of the Sheriff's deputy regarding Dulaney's statements that the men "were shooting up [his] house with [his] family inside" and, "what was [he] supposed to do when [Torrey] was charging down the hill at [him] in [his] house?" Also, over the State's objection, the court permitted Dulaney to cross-examine the crime scene investigator regarding dozens of bullet holes throughout Dulaney's home and shattered upstairs glass, which the State argued "show[ed] potential danger to people inside the house" ahead of the defendant's case. Finally, during closing argument, defense counsel argued to the jury that the State had not met its burden to prove, beyond a reasonable doubt, that Dulaney committed the charged offenses and that his use of force was not justified.

¶35 Contrary to the parties' assertions and as explained above, a defendant conceding knowing and purposeful *conduct* to assert a justifiable use of force defense is not also a concession that the defendant intended the conduct to cause a "specific *result*." Therefore, the District Court's requirement that Dulaney testify that he purposely and knowingly *used force* in self-defense was neither error nor a separate requirement that he admit he did so with "the purpose to commit" deliberate homicide. *See* §§ 45-5-102(1)(a), 45-4-103(1), 45-5-101(35), (65), MCA. While the court's musings that, to lay a foundation for his defense, Dulaney would have to testify as to his awareness "that there was a high

24

likelihood" that his use of force "would cause serious bodily injury or death," misstated Dulaney's burden of production on a justifiable use of force defense, Dulaney made no admissions to that effect. Instead, he testified unequivocally that he did not intend his use of force to kill any of the men on his property that day. We therefore hold that, despite its erroneous statements, the District Court properly required evidence that Dulaney purposely and knowingly used force, but did not require him to concede every element of the charged offenses to assert his justifiable use of force defense.

¶36 As a related matter, Dulaney further asserts on appeal that the given mental state instructions violated his due process rights because "they relieved the State of its burden to prove" the elements of attempted deliberate homicide. At settling of jury instructions, Dulaney stipulated to "joint" result-based "purposely" and "knowingly" mental state instructions; instruction that the defendant's "state of mind," including "purpose and knowledge," may be inferred from the defendant's "acts and all other facts and circumstance in evidence"; and to separate instruction on the offenses of deliberate homicide and attempt. He also stipulated to instruction that, to convict on the offense of attempted deliberate homicide, the State had to prove:

> that the defendant performed an act toward the commission of the offense of Deliberate Homicide; AND that the defendant did so with the purpose to commit the offense of deliberate homicide.

¶37 We may "review unpreserved errors that implicate fundamental rights where failure to review them 'may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process.'" *Marfuta*, ¶ 21 (citing *State v. Deveraux*, 2022 MT 130,

25

¶ 21, 409 Mont. 177, 512 P.3d 1198). "We invoke the plain error doctrine sparingly, on a case-by-case basis." *Daniels*, ¶¶ 32-33.

¶38 In *Marfuta*, we considered the defendant's claim that the district court had erroneously refused his proffered jury instruction on attempted deliberate homicide. There, the court instructed the jury that "Attempted Deliberate Homicide was committed when a person, with the purpose to commit the offense of deliberate homicide . . . commits any act towards the commission of the offense of deliberate homicide," which it reasoned was "the more correct statement of law." *Marfuta*, ¶ 15. First, we stated that the "result-based" offense of attempted deliberate homicide "requires proof that the defendant had the purpose to cause the death of another human being and acted toward purposely or knowingly causing the death of another human being." *Marfuta*, ¶ 38 (citing *Sellner*, 286 Mont. at 401, 951 P.2d at 998; *Ilk*, ¶ 19). Then, considering the court's instructions as a whole, we held that:

> the District Court instructed the jury on the statutory definitions of "purposely" and "knowingly," which both included result-based language, and to which the parties stipulated. The District Court's instructions on Attempted Deliberate Homicide further stated that one must perform the act with "the purpose to commit the offense of deliberate homicide." In referencing the specific counts with which Marfuta was charged, the District Court specified that the State had to prove Marfuta "performed an act toward the commission of the offense of Deliberate Homicide by firing a gun . . . with the purpose to commit the offense of Deliberate Homicide." While the firing of a gun is conduct-based, the purpose to commit Deliberate Homicide addresses the result, which the District Court instructed was "caus[ing] the death of another human being." [The] [i]nstruction[s] [also] informed the jury of their ability to "infer the Defendant's state of mind, including his/her purpose and knowledge, from the Defendant's acts and all other facts and circumstances in evidence which indicate his/her state of mind."

> We conclude that, when considered as a whole, the instructions given by the District Court properly permitted a guilty verdict *if the jury found the accused's deliberate yet incomplete actions were directed towards either purposefully or knowingly causing the death of another*. The jury was free to infer from the evidence presented at trial whether Marfuta acted with the purpose of committing Deliberate Homicide. . . . [T]he jurors were provided with jury instructions that correctly captured all of the elements of the Attempt and Deliberate Homicide statutes. Therefore, we conclude the instructions as a whole were minimally sufficient to fully and fairly instruct the jury on relevant law.

*Marfuta*, ¶¶ 15, 39-40 (emphasis added).

¶39 Here, the mental state and offense instructions were nearly identical to those given in *Marfuta*, and, like there, Dulaney stipulated to the instructions. Additionally, for reasons stated above, Dulaney's testimony that he used force in self-defense was not an unconstitutional admission of guilt to the charged offenses. Finally, the jury was thoroughly instructed as to the State's burden to prove beyond a reasonable doubt "each of the elements of the crime[s] charged," and its additional burden to prove beyond a reasonable doubt that Dulaney's use of force "was not justified." Under the totality of circumstances here, the District Court fully and fairly instructed the jury on the relevant law, and Dulaney is therefore not entitled to plain error review.

¶40 2. *Did the District Court abuse its discretion when it excluded the testimony of the Defendant's expert witness?*

¶41 M. R. Evid. 701-05 govern the admissibility of expert witness testimony. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

27

"The test for the admissibility of expert testimony is whether the matter is sufficiently beyond common experience that the opinion of the expert will assist the trier of fact to understand the evidence or to determine a fact in issue." *Hulse v. DOJ, Motor Vehicle Div.*, 1998 MT 108, ¶ 48, 289 Mont. 1, 961 P.2d 75; *State v. Santoro*, 2024 MT 136, ¶ 20, 417 Mont. 92, 551 P.3d 822. "The crucial question" on admissibility "is whether the subject is one of such common knowledge that [people] of ordinary education could reach a conclusion as intelligently as the witness, or whether the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." *State v. Arlington*, 265 Mont. 127, 139-40, 875 P.2d 307, 315 (1994) (citation omitted). *See also Howard*, 195 Mont. at 404-05, 637 P.2d at 17 (expert opinion testimony inadmissible where "jury was as qualified as [the expert] to draw an inference from the circumstantial evidence as to intent"). The threshold determination for the trial court therefore is "whether the subject matter of the testimony is one that requires expert testimony." *Santoro*, ¶ 20 (citation omitted); *accord Durbin v. Ross*, 276 Mont. 463, 469, 916 P.2d 758, 762 (1996) (expert testimony "superfluous where the subject matter is within the knowledge or experience of laypersons"); *H-D Irrigating, Inc. v. Kimble Props., Inc.*, 2000 MT 212, ¶ 34, 301 Mont. 34, 8 P.3d 95 ("[a] case that does not require specialized knowledge[] does not require expert testimony").

¶42   Because "not all exposition testimony will necessarily assist or enlighten the jury," expert testimony, "like all evidence, . . . must be relevant," i.e., "have the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *State v. Jay*, 2013 MT

28

79, ¶¶ 27-34, 369 Mont. 332, 298 P.3d 396 (citing M. R. Evid. 401 (punctuation altered)). Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M. R. Evid. 403. The district court has great latitude in ruling on the admissibility of expert testimony, and we will not overturn that ruling absent an abuse of discretion. *Larson*, ¶ 29.

¶43 Pretrial, Dulaney conceded that "whether [he] reasonably believed [his] use of force was necessary [was] a question for the jury," and that his proffered expert would "not offer any testimony on that point."[16] Instead, Dulaney asserted below and on appeal that Marbut's testimony would "help clarify" that it was "possible" Torrey "could have turned around in the time it took [Dulaney] to fire his weapon," and thereby explain "the mechanics of the shooting" and "the discrepancy" in Dulaney and Torrey's versions of events.

¶44 However, the fact that Torrey sustained a gunshot wound in his back was not in dispute. Torrey testified that he had "turned around and started back up the hill' when he "heard gunshots" and "was shot in the back." Dulaney testified on direct examination that when he came out his house with the gun, he "believed" Torrey saw it, because "that's when he yelled, 'Are you gonna shoot me? Shoot me.'" Dulaney said that, after he fired

---

[16] Dulaney similarly concedes on appeal that whether his "actions were reasonable" and "what Dulaney may have reasonably believed when he pulled the trigger . . . was never what Dulaney's counsel intended Mr. Marbut to testify about."

the first of five rapid shots, he saw Torrey "spin around" and fall to the ground. On cross-examination, Dulaney testified that he shot first when Torrey was "facing towards" him; then, as he continued firing, saw Torrey spin "like he was trying to duck and get out of the way"; and conceded that, as Torrey spun around, "he may have got hit in the back." While their testimony conflicted as to whether Torrey was facing him when Dulaney fired the first shot, it was "within the province of the jury to weigh the evidence based on the credibility of the witnesses and determine which version of events should prevail." *State v. Weigand*, 2005 MT 201, ¶ 7, 328 Mont. 198, 119 P.3d 74. The layperson jury would not require specialized knowledge or the aid of an expert to understand Dulaney's own testimony that Torrey was shot in the back while turning away from rapid gunfire.

¶45 Dulaney further asserts that, without his expert's explanatory testimony, he was unable to rebut the State's evidence that Torrey was shot in the back, which he says the State used to materially undermine his justification defense. Pretrial, and as an implicit condition of excluding Marbut's testimony, the State agreed that it would not specifically argue Dulaney's use of force was unreasonable because Torrey was in apparent retreat when shot, but instead would argue that his use of force was not reasonable at all. Despite Dulaney's assertions that the State reneged on that promise, careful review of the record reveals that the prosecutor's statements during closing argument regarding Torrey's being shot in the back were largely directed to Dulaney's contrary testimony that Torrey was the aggressor and facing Dulaney when Dulaney fired the first shot. Therefore, the prosecutor's statements were proper to assist the jury in resolving those factual disputes. As stated above, the jury could certainly resolve those issues without Marbut's testimony

30

that Dulaney's version of events was "possible." Accordingly, we hold that the District Court did not abuse its discretion in excluding Dulaney's expert witness.

¶46    3. *Did the District Court erroneously deny the Defendant's post-verdict § 46-16-702, MCA, motion for a new trial or judgment of acquittal?*

¶47    After trial, Dulaney filed a motion pursuant to § 46-16-702, MCA, asking the District Court to vacate his jury verdict on all counts, or in the alternative, grant him a new trial. Specifically, Dulaney argued that he was entitled to the requested relief either under the court's "plenary power" of review of the trial evidence, or "upon review for sufficiency of the evidence," the apparent distinction being that under the first circumstance, the court was free to make its own evidentiary weight and credibility determinations. The District Court denied his motion without hearing, and we affirm.

¶48    There are three circumstances prior to appeal or postconviction proceedings where a criminal defendant may challenge the sufficiency of the State's trial evidence: at the close of the State's case-in-chief; at the close of all the evidence; or, following a guilty verdict, in a § 46-16-702, MCA, motion for a new trial. Sections 46-16-403, -702, MCA. "[A]t the close of the prosecution's evidence or at the close of all the evidence," § 46-16-403, MCA, authorizes a district court, either sua sponte or on motion, to "dismiss the action and discharge the defendant," if the evidence presented "is insufficient to support a finding or verdict of guilty." The essence of the motion to dismiss for insufficient evidence[17] is "that the prosecution has failed as a matter of law to prove the charges beyond

---

[17] Section 46-16-403, MCA, motions to dismiss for insufficient evidence have been alternatively referred to as motions for "directed verdict," "directed verdict of acquittal," or "judgment of acquittal." *State v. McWilliams*, 2008 MT 59, ¶¶ 36-37, 341 Mont. 517, 178 P.3d 121; *Mackrill*,

a reasonable doubt" and therefore "that the prosecution's evidence is insufficient as a matter of law" to sustain a conviction. *State v. McWilliams*, 2008 MT 59, ¶¶ 36-37, 341 Mont. 517, 178 P.3d 121; *State v. Barrows*, 2018 MT 204, ¶¶ 16-18, 392 Mont. 358, 424 P.3d 612 (§ 46-16-403 "[d]ismissal of a charge for insufficiency of the evidence is an acquittal"). "In a criminal case, a motion for dismissal for insufficiency of the evidence under § 46-16-403, MCA, is only appropriate if, viewing the evidence in a light most favorable to the prosecution, no evidence exists upon which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *Bomar*, ¶¶ 13-15; *State v. Swann*, 2007 MT 126, ¶ 16, 337 Mont. 326, 160 P.3d 511; *State v. LaMere*, 2003 MT 49, ¶ 15, 18-26, 314 Mont. 326, 67 P.3d 192 ("[v]iewing evidence in a light most favorable to the prosecution requires that we view the evidence and all inferences to be drawn therefrom in the strongest light possible which supports establishment of the State's case").

¶49 We review the denial of a § 46-16-403, MCA, motion de novo, applying the same standard as the trial court. *Swann*, ¶¶ 16-19; *State v. Rosling*, 2008 MT 62, ¶ 33, 342 Mont. 1, 180 P.3d 1102. De novo review is appropriate because "[t]here either is, or is not, sufficient evidence to convict, and the determination is not a matter of discretion." *Swann*, ¶¶ 16-19; *Bomar*, ¶ 13. We likewise review an appellate challenge to the sufficiency of the evidence to support a conviction under the same standard. *See Rosling*, ¶¶ 2 n.2, 33, 35; *Mummey*, 264 Mont. at 276, 871 P.2d at 869. *See also State v. Downing*, 240 Mont.

¶ 16; *State v. Wendler*, 2008 MT 370, ¶ 15, 346 Mont. 467, 197 P.3d 932; *State v. White-Water*, 194 Mont. 85, 87-88, 634 P.2d 636, 637-38 (1981).

215, 216-17, 783 P.2d 412, 413-14 (1989) (trial court's standard and our standard of review "gives full consideration to the jury's role"); *LaMere*, ¶¶ 15, 18-26 ("[w]hether the trial court or this Court would have viewed the evidence or found the facts differently from the jury is not the appropriate inquiry"); *McWilliams*, ¶ 37 ("determinations of the credibility and weight of testimony are within the exclusive province of the jury, and conflicting testimony does not render the evidence insufficient to support a guilty verdict").

¶50 Then, "[f]ollowing a verdict or finding of guilty," § 46-16-702(1), MCA, authorizes a district court, sua sponte or on motion, to grant a new trial "if required in the interest of justice." Section 46-16-702, MCA, essentially provides two forms of relief from a guilty verdict: either a new trial or a modified verdict, including a judgment of acquittal. *See* § 46-16-702(3), MCA ("[o]n hearing the motion for a new trial," court may "modify or change the verdict or finding by finding the defendant guilty of a lesser included offense or finding the defendant not guilty"); *Mackrill*, ¶¶ 16, 26; *McWilliams*, ¶ 41; *Mummey*, 264 Mont. at 276, 871 P.2d at 869. The court may only grant this relief "if justified by law and the weight of the evidence." Section 46-16-702(3), MCA.

¶51 We generally review rulings on motions for new trial for an abuse of discretion. *See State v. Chavis*, 2019 MT 108, ¶¶ 6-12, 395 Mont. 413, 440 P.3d 640 (newly discovered evidence); *McWilliams*, ¶ 42 (prosecutorial misconduct); *State v. Dunfee*, 2005 MT 147, ¶¶ 13-18, 327 Mont. 335, 114 P.3d 217 (juror misconduct). However, we review rulings on § 46-16-702(3) motions "based on the sufficiency of the evidence," including motions to modify or vacate a jury verdict based on "the weight of the evidence," de novo. *See Mackrill*, ¶ 18; *Bomar*, ¶ 15; *McWilliams*, ¶ 42 n.2 (citing § 46-16-702(3)(c), MCA). *See*

33

*also State v. Bauer*, 2002 MT 7, ¶¶ 14-15, 308 Mont. 99, 39 P.3d 689 (assessing defendant's post-judgment "motion for directed verdict" under standard for mid-trial "directed verdict of acquittal").

¶52    A successful challenge to the sufficiency of the trial evidence to support a jury verdict does not result in a new trial.  *Polak*, ¶ 35 (citing *State v. Warren*, 192 Mont. 436, 441-42, 628 P.2d 292, 295-96 (1981)); § 46-16-702(3)(c), MCA (providing for "finding of not guilty" "if justified by law and the weight of the evidence").  Instead, where a defendant establishes that his or her guilty verdict was not supported by or was contrary to the trial evidence, "the proper remedy is a judgment of acquittal."  *See Polak*, ¶ 35; *State v. Craft*, 2023 MT 129, ¶ 20, 413 Mont. 1, 532 P.3d 461; *Barrows*, ¶¶ 16-18; *Warren*, 192 Mont. at 441-42, 628 P.2d at 295-96 (otherwise, "[a]llowing the state a second chance to buttress its case" on retrial "would expressly violate" double jeopardy).  Accordingly, because the grant of a § 46-16-403, MCA, motion to dismiss for insufficient evidence and a § 46-16-702(3)(c), MCA, motion to vacate a jury verdict and enter a finding of not-guilty are in substantive essence both judgments of acquittal based on court assessment of the insufficiency of the trial evidence to support a guilty verdict as a matter of law, courts apply the same standard to either motion:  whether, when viewing the trial evidence in the light most favorable to the prosecution, no evidence exists upon which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.

¶53    Here, Dulaney's motion specifically challenged the sufficiency of the trial evidence to support his guilty verdict.  Correctly recognizing that Dulaney offered no additional evidence, new or otherwise, that would entitle him to a new trial, the District Court properly

34

construed his § 46-16-702, MCA, motion as one to modify the jury verdict and find him not guilty of attempted deliberate homicide. *See Mummey*, 264 Mont. at 275-76, 871 P.2d at 869 (construing defendant's post-verdict "motion for judgment notwithstanding the verdict" as a motion to "modify or change the verdict" under § 46-16-702).[18] Dulaney would thus be entitled to a finding of not guilty on any or all of the offenses only if, viewing the evidence in a light most favorable to the prosecution, no evidence existed upon which a rational trier of fact could find the essential elements of the crimes beyond a reasonable doubt, including that his use of force was not justified under the circumstances.

¶54   At trial, the State presented evidence that Dulaney, when approached by Torrey and the Clifton brothers, retrieved a pistol from inside his house and began rapidly shooting, first at Torrey, and then at the Clifton brothers when they both returned fire. The thrust of the State's evidence was that Dulaney, embroiled in an escalating dispute with his neighbor, was incensed over the events leading up to that moment and shot first at all three men, not based on a reasonable belief that deadly force was necessary to save his own life, but in a rage and with the intent to end theirs. Dulaney conversely testified that he saw the three men approach, who he believed were all armed, and, fearing imminent unlawful harm to himself and his family, shot at Torrey as he headed directly toward where Dulaney stood, and shot at the Clifton brothers because they were shooting at him and his house with his

---

[18] Notably, Dulaney does not challenge the District Court's denial of his § 46-16-403, MCA, motion to dismiss for insufficient evidence on the elements of attempted deliberate homicide at the close of the State's case-in-chief; and instead focuses his post-judgment argument on the State's alleged failure to meet its responsive burden to prove absence of justification beyond a reasonable doubt.

family inside. Viewing the trial evidence and all inferences to be drawn from it in the light most favorable to the prosecution, and in a manner that fully acknowledges the jury's role to assess witness credibility and resolve conflicts in testimony, any rational juror could have disbelieved Dulaney's justification defense and found him guilty beyond a reasonable doubt. The District Court therefore did not err in denying Dulaney's § 46-16-702(3)(c), MCA, post-verdict motion for a judgment of acquittal.

## CONCLUSION

¶55 We hold that the District Court did not ultimately require Dulaney to admit all of the elements of attempted deliberate homicide and did not err in requiring evidence that Dulaney purposely and knowingly used force to assert his justifiable use of force defense. We further hold that the court did not erroneously exclude the testimony of Dulaney's proffered expert witness. Finally, we hold that sufficient evidence supported the jury's verdict, and the District Court therefore correctly concluded that Dulaney was not entitled to a judgment of acquittal.

/S/ KATHERINE M BIDEGARAY

We Concur:

/S/ CORY J. SWANSON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JIM RICE

Chief Justice Cory J. Swanson, concurring.

¶56    I join the Majority on Issues One and Three, but write separately to concur on Issue Two.  I agree that the District Court did not abuse its discretion when excluding the expert witness prior to the trial.  However, the District Court's pretrial exclusion of Dulaney's expert witness was based upon representations of trial evidence that did not come to fruition.  But Dulaney failed to re-raise the issue at trial when the testimony of the victim and Dulaney implicated the expert's excluded testimony.  The issue did not rise to the level of plain error, and therefore I concur in the result.

¶57    A defendant has a constitutional right to present a complete defense, particularly when the defendant attempts to offer evidence which goes to the "core of his defense." *State v. Santoro*, 2024 MT 136, ¶ 26, 417 Mont. 92, 551 P.3d 822.  The right to present a defense, however, is limited by the Montana Rules of Evidence and Montana Rules of Criminal Procedure.  For example, generally, a defendant's witnesses cannot introduce the defendant's prior statements in violation of the hearsay rule, *In re C.K.,* 2017 MT 69, ¶ 21, 387 Mont. 127, 391 P.3d 735; a defendant's witness cannot rob the jury of its duty to determine the credibility of witnesses, *State v. Robins*, 2013 MT 71, ¶ 11, 369 Mont. 291, 297 P.3d 1213; and a defendant's witness cannot otherwise invade the province of the jury, *State v. Walker*, 2018 MT 312, ¶ 34, 394 Mont. 1, 433 P.3d 202.

¶58    The admissibility of expert testimony is governed by M. R. Evid. 702.  A party offering expert testimony must show the subject is "sufficiently beyond common experience that the opinion of the expert will assist the trier of fact to understand the evidence or to determine a fact in issue."  *Hulse v. Dep't of Just., Motor Vehicle Div.*,

37

1998 MT 108, ¶ 48, 289 Mont. 1, 961 P.2d 75. An individual testifying as an expert must first be deemed qualified on that subject to offer an expert opinion. Qualification may be demonstrated by possession of "knowledge, skill, experience, training, and education." *State v. Russette*, 2002 MT 200, ¶ 14, 311 Mont. 188, 53 P.3d 1256.

¶59 Dulaney disclosed a proposed expert witness, Gary Marbut, and enclosed an article Marbut had previously written—not about Dulaney's case—entitled *Shots in the Back – Are They 'Legal'?, An Explanation for Self-Defense*. Dulaney's initial notice stated that he intended to "offer at trial" this article and other exhibits recounting Marbut's background, experience with firearms, and presumably the content of his expert testimony. The State correctly objected to aspects of Marbut's article—and therefore the expected scope of his testimony—on the grounds that he should not be permitted to offer a legal opinion, testify as to the ultimate issue reserved for the jury, opine regarding the reasonableness of Dulaney's conduct, or testify whether pulling the trigger was an involuntary act. *State v. Mills*, 2018 MT 254, ¶ 39, 393 Mont. 1211, 428 P.3d 834; *Perdue v. Gagnon Garms, Inc.*, 2003 MT 47, ¶ 28, 314 Mont. 303, 65 P.3d 570; *Comm'r of Political Practices for Mont. v. Wittich*, 2017 MT 210, ¶¶ 39–41, 388 Mont. 347, 400 P.3d 735. Those are valid objections, which would justify the District Court's order limiting or curtailing Marbut's testimony accordingly. But these objections did not necessarily bar all of Marbut's offered testimony. He could have potentially still testified about an elaborate experiment he conducted with multiple shooters of varying experience, each firing at target dummies mounted on a rotating mechanism to measure whether a person could initiate a

firing sequence at a threatening person, only to have the bullet impact the threat's back due to its rotation during the firing sequence.

¶60    In view of this proffered expert testimony, the State then offered an evidentiary stipulation to further explain why Marbut's testimony was unnecessary:

> The State does not dispute that Mr. Marbut could testify based on his training and experience that [the victim] could have turned around in the amount of time that it took the Defendant to fire his weapon. Such testimony could be helpful to the jury to explain how [the victim] was struck in the back. However, *that is precisely what the evidence in this case will show – that [the victim] was turning when the Defendant fired his weapon. The fact is not in dispute* and Mr. Marbut's testimony would therefore be cumulative and should be excluded pursuant to Mont. R. Evid. 403.

(Emphasis added.)

¶61    Dulaney's counsel responded to this representation, "[i]t is almost undoubtable, however, that the State will argue that the fact the alleged victim was shot in the back is evidence that Defendant did not believe the use of force was reasonably necessary for his self-defense."

¶62    On reply, the State further reinforced its expectation of the evidence at trial and how it would be argued regarding Dulaney's assertion of justifiable use of force:

> The fact that [the victim] was able to turn around in the amount of time that it took the Defendant to raise his firearm and pull the trigger but before he could recognize that [the victim] was retreating is not in dispute. *The State will not argue at trial that the Defendant should have recognized that [the victim] was turning to retreat when he pulled the trigger.* The State will argue that *the Defendant's use of force in its entirety was unreasonable –* that a reasonable person under like or the same circumstances would not have pulled the trigger at all.

(Emphasis added.)

39

¶63 Relying on the State's assertions, the District Court granted the State's motion in limine, stating "[a]t trial, the State will be held to its concessions which obviates the need for the defense to call Mr. Marbut as a witness."

¶64 In fairness to the District Court, this was a pretrial ruling, based upon the expected evidence as represented by the parties. Pretrial evidentiary rulings are necessary to shape the duration and course of trial, and they are subject to an abuse of discretion standard of review. *City of Missoula v. Mountain Water Co.*, 2016 MT 183, ¶ 18, 384 Mont. 193, 378 P.3d 1113. Here, the District Court likely erred in foreclosing Marbut's testimony, limited to the scope offered by Dulaney, for two reasons. First, I disagree with the Majority's assessment that the common juror—even in Montana—has sufficient firearms experience that expert testimony about this complicated scenario would be unhelpful. Opinion, ¶ 44.

¶65 Second, it would be a gross misreading of Rule 403 to decide a single expert witness testifying about a defendant's justifiable use of force theory is a "needless presentation of cumulative evidence." Opinion, ¶ 42. It would appear to be neither needless nor cumulative. In *State v. Gleed*, 2014 MT 151, ¶¶ 16-17, 375 Mont. 286, 326 P.3d 1095, we held the district court abused its discretion in denying a defendant's motion for a day and a half continuance to allow his defense expert witness to testify during trial. Analyzing the proposed testimony, we highlighted how the expert was critical in establishing a defense and the defendant's expert was the only source of that evidence. *Gleed*, ¶ 17. Similarly here, Marbut was the only disclosed defense expert to testify about the central issue in the case, and his testimony was critical to Dulaney's assertion of justifiable use of force.

¶66    Having said that, the District Court's decision on this matter is not subject to de novo review.  It is reviewed for an abuse of discretion.  Based upon the State's pretrial representations, I cannot say the District Court abused its discretion, even if I would have reached a different decision.  The reason it does not rise to abuse of discretion is because the District Court was presented with a scenario where the factual evidence on this fine point was not in dispute, which differs from the factual disagreement in *Gleed*.

¶67    So far, so good.  But trial turned out differently.

¶68    At trial, the victim testified first.  He stated he walked "sidehill" down a steep incline to go fight with Dulaney, but only took two steps.  He stated he saw Dulaney go inside his house, and he thought the fight was not going to happen.  The victim testified he turned around and started going back up the hill.  The victim then testified his back was to Dulaney.  The prosecutor asked, "What happened next?" to which he replied, "I was shot in the back."  The prosecutor appeared to solicit testimony from the victim regarding his turning movement.  He posed the questions, "bullet went in your left shoulder?"; "Did you turn to your left or turn to your right?"; and "So you turned left to go back up the hill?"  Despite those prompts, the victim stuck to his testimony he was shot "in the back."

¶69    On cross examination, the victim testified when Dulaney went into his house, the victim thought there would not be a fight, and he turned and started walking back up the hill, but did not get all the way up the hill.  The end result of the victim's testimony was an account that his back was fully turned toward Dulaney when he was shot; there was no testimony of him turning immediately before or at the time of the shooting.  It appears from the State's follow up questions the victim's testimony may have differed from what the

41

prosecutors expected. These things happen at trial. An attorney would be understandably reluctant to call a time-out and instruct the witness, "you're supposed to testify you were turning when he shot you, remember?" Unless he suspects perjury, the attorney must accept the testimony the witness offers under oath or weigh the risk of impeaching him with pretrial statements or other evidence in the record.

¶70 Dulaney testified that during the exchange of threatening words prior to the shooting, the victim was in fact standing sideways on the steep slope, and the victim was not retreating back up the hill. In fact, Dulaney testified the victim was actually advancing down the slope and was near a tree at the bottom of the hill. Dulaney testified the victim turned as he fired, or perhaps turned as a result of the bullet's impact: "I fired my first shot, and I saw [the victim] spin around. And there was a continuous firing, and I saw him fall to the ground." He then answered "no" to the question, "If his back was presented to you, would you have fired at him?"

¶71 On cross-examination, the prosecutor pressed Dulaney on whether the victim was facing him:

Q: Okay. Your attorney asked you if you shot him -- you wouldn't have shot him in the back had you -- had he turned, right?

A: No, sir.

Q: And you saw him go down on the first shot. That was your testimony?

A: Hmm, no. I shot and then I saw him spin as I was firing the rest of my shots.

Q: Right. The first shot spun him around?
A: The first shot didn't spin him around as much as he spun -- it was like he was trying to duck and get out of the way.

42

Q: So it is your testimony that you think you hit him with the second shot?

A: Second, maybe third?

Q: In the back?

A: That is -- but I didn't shoot him in the back. He was facing towards me and he spun around, and he may have got hit in the back, but I didn't shoot him in the back.

Q: Mr. Dulaney, there's only two ways this could work, right? You shot him in the chest with the first shot and spun him around, or you shot him in the back on any of the other shots.

A: I'm not sure what happened . . . . I fired my shots, and he -- he spun and went down. And that's what I know.

¶72 At this point, the evidence was different from the pretrial offers on which the District Court relied. The victim did not testify he was turning at the time of the shooting, but stated he was facing entirely away from Dulaney. Dulaney testified the victim was turning, or may have turned as a result of a bullet impact. There was plenty of dispute over the shooting, and the very issue Marbut had expected to cover in his testimony—how a person could fire at someone he perceived to be a threat and then hit him in the back due to the target's rotation—was in controversy.

¶73 It was now up to Dulaney to re-raise the issue with the District Court and request leave to call Marbut to explain this re-joined complex factual dispute to the jury. The State was not under an obligation to make Dulaney's case for him, but having opened the door, it would have been difficult for the State to resist such a mid-trial request. *See State v. Polak*, 2018 MT 174, ¶ 23, 392 Mont. 90, 422 P.3d 112 (State opened the door to admission of previously excluded evidence of drug use when the State questioned the

43

witness about his sobriety during a shooting). After all, the State's main argument for excluding the expert was the expectation his testimony would be cumulative, and the State based that argument on its concession.

¶74 Dulaney did not re-raise the issue, and he did not object during the State's closing argument regarding "shot in the back" that he now criticizes on appeal. The District Court did not have the opportunity to address its prior ruling after seeing the differing accounts at trial. "In order for a motion in limine to sufficiently preserve an issue on appeal without an objection at trial, a party must obtain a definitive ruling on the issue from the district court." *State v. Favel*, 2015 MT 336, ¶ 21, 381 Mont. 472, 362 P.3d 1126. The District Court's granting of the motion in limine was conditional on the State's concession. When the State's evidence changed from its pretrial representation, the issue needed to be raised again to obtain a definite ruling on the expert under the changed circumstances. The issue was not raised again, so this matter would have to come before us under plain error review.

¶75 The State did not respond to Dulaney's testimony as it told the court it would in the pretrial briefing. This change of approach was triggered by the unanticipated disagreement between the two key witnesses—Dulaney and the victim—on the victim's body position at the time of the shooting. But it did not violate its pretrial commitment to the court, "[t]he State will not argue at trial that the Defendant should have recognized that [the victim] was turning to retreat when he pulled the trigger." Rather, the State focused its arguments on the factual disputes between the two main witnesses: the victim claimed he was shot near the top of the hill with his back fully turned toward Dulaney; and Dulaney claimed the victim was near the bottom of the hill and he was turning as Dulaney fired.

¶76    During the State's first closing, the prosecutor stated about Dulaney's account:

> [H]e testified on direct, I shot first and he spun, right? And I asked him – or, he testified he wasn't shot in the back, right? He thinks that first shot hit him in the front. That puts you: [the victim's] in the best position to know where he was hit, right? Even if you assume that [the victim] had turned as a result of that first shot, he still got hit in the back.

¶77    Then on rebuttal, the prosecutor reminded the jury, "[the victim] told you that he turned around -- he turned around and was leaving, and the defendant fired at all three of them five times. . . . He was shot, the evidence shows, he was just a couple of steps down the ravine, and he was shot in the back."

¶78    The State stuck to its pretrial commitment, "[t]he State will not argue at trial that the Defendant should have recognized that [the victim] was turning to retreat when he pulled the trigger," but would argue that Dulaney's entire course of conduct was unreasonable because he should not have shot at the victim, regardless of his body position of turning or facing away. The argument focused on both the reasonableness of Dulaney's conduct, as well as comparing the circumstantial evidence to determine whose account was more reliable. The State could do so confidently, knowing Dulaney's expert was not allowed to address the possibility of the very event and sequence Dulaney described and his counsel anticipated in retaining an expert.

¶79    Standards of review matter at the appellate level. It's not our job to re-try the case. District court's pretrial rulings on expert witnesses and motions in limine are subject to the abuse of discretion review. I would have issued a different ruling on Marbut's testimony because Dulaney has a right to put on a full defense. Marbut's opinion could have been cabined to only address the complicated firing and target-turning sequence which was

45

central to this case, and the matter was sufficiently outside the common experience of the jurors to allow expert testimony.[1]  Marbut's testimony was also far from needlessly cumulative.  But the District Court did not abuse its discretion in excluding Marbut's testimony at the time, based upon the pretrial representation that the witnesses would all agree the victim was turning at the time Dulaney fired his gun.  When the testimony at trial differed from this offer, Dulaney failed to seek leave to call Marbut to explain the very issue which was teed up for the jury, and he failed to object during the State's closing argument.  Because the issue was not raised again, we cannot fault the District Court for its failure to sue sponte revise its pretrial order.  Plain error review is therefore inappropriate.

¶80     I concur with the Majority in their disposition.


                                    /S/ CORY J. SWANSON


Justice Jim Rice joins in the Concurrence of Chief Justice Swanson.


                                    /S/ JIM RICE

---

[1] The State did not contest Marbut's qualifications.