FILED

04/28/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 23-0503

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 88

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

RICK DENNIS STROBEL,

       Defendant and Appellant.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause Nos. BDC 2019-172 and BDC 2022-577
Honorable Michael F. McMahon, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

       Darcy Critchfield, Attorney at Law, PLLC, Billings, Montana

       For Appellee:

       Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant Attorney General, Helena, Montana

       Kevin Downs, Lewis and Clark County Attorney, Helena, Montana

Submitted on Briefs:  April 1, 2026

Decided:  April 28, 2026

Filed:

       _____

                Clerk

Justice Katherine M. Bidegaray delivered the Opinion of the Court.

¶1 Rick Dennis Strobel appeals two judgments from the Montana First Judicial District Court, Lewis and Clark County. Each judgment issued the same day, but in two separate proceedings. We consolidated Strobel's separate appeals.

¶2 First, Strobel appeals his July 2023 judgment and sentence upon jury conviction of felony Intimidation, § 45-5-203(1), MCA, in Cause No. DC 2022-577. Second, Strobel appeals his July 2023 judgment and sentence on revocation for a separate prior conviction on three counts felony violation of an order of protection, § 45-5-626(1), (3), MCA, in Cause No. DC 2019-172.

¶3 Strobel raises numerous issues in both appeals, which we restate as follows. Regarding Strobel's appeal of his July 2023 sentence on jury verdict in DC 2022-577:

1. *Whether the trial court erroneously denied Strobel's motion to dismiss for insufficient evidence.*

2. *Whether the trial court erred by instructing the jury that evidence of a victim's failure to make a timely complaint does not raise any presumption as to the victim's credibility.*

3. *Whether the trial court abused its discretion in controlling the presentation of evidence regarding McAlpin's inconsistent statements.*

4. *Whether Strobel has shown reversible plain error based on his unpreserved claims of erroneous admission of propensity evidence, jury instruction error, or prosecutorial misconduct.*

5. *Whether Strobel's attorneys were constitutionally ineffective.*

6. *Whether Strobel has shown cumulative error warranting reversal.*

Regarding Strobel's appeal of his July 2023 sentence on revocation in DC 2019-172:

7. *Whether the sentencing court erroneously denied credit for elapsed time without a documented violation.*

We affirm on all issues.

## FACTUAL AND PROCEDURAL BACKGROUND

**Revocation Proceedings in DC 2019-172**

¶4 The State charged Strobel by Information in April 2019 with felony stalking for repeatedly contacting the subject of a Jefferson County protective order against him. In November 2019, Strobel entered a plea agreement whereby the State agreed to amend the stalking charge to three counts felony violation of an order of protection in exchange for Strobel's guilty pleas. Strobel pleaded guilty to the three felonies and was sentenced in November 2019 to the Montana State Prison (MSP) for 5 years, all suspended.[1]

¶5 In November 2022, the State petitioned to revoke Strobel's suspended sentence. The petition alleged six compliance violations and one non-compliance violation based on the newly initiated criminal proceedings, DC 2022-577, where Strobel was charged with felony Intimidation. The circumstances of that offense are described below.

**Jury Trial in DC 2022-577**

¶6 Simultaneous to its petition to revoke Strobel's probationary sentence, the State charged Strobel by Information for felony Intimidation in DC 2022-577. This charge arose out of an incident on November 9, 2022, at the Montana Department of Corrections Pre-Release Center in Helena. After testing positive when reporting for

---

[1] This sentence ran concurrent with Strobel's sentence in Jefferson County for a similar violation of the same protective order.

probation-mandated urinalysis testing (UA), Strobel allegedly became irate with the staff member administering the test, Curt McAlpin, and threatened to "shoot up" the center.

¶7 Strobel pleaded not guilty and the case proceeded to a jury trial on April 17, 2023. There, the parties stipulated pretrial that, for context purposes, the State could elicit testimony that Strobel was at the pre-release center on order to provide a UA as a probation condition, but there could be no testimony about why he was on probation or the actual results of the test.[2] Defense counsel represented to the court twice that he had consulted with Strobel, who agreed with the stipulation as a strategic choice. Defense requested a limiting instruction regarding this "other acts" evidence, agreeing it was admissible to show motive and/or opportunity but not propensity. The court gave the requested limiting instruction before and after presentation of evidence.

¶8 McAlpin testified that, when Strobel arrived at the pre-release center on November 9, 2022, to provide a UA, he appeared "agitated." McAlpin described Strobel's demeanor prior to testing as "upset," "distraught," "bullying," "combative," and "ready to tussle." McAlpin said Strobel's mannerisms caused him "alarm" and "a little apprehension." The two men entered a small room to obtain a sample. Upon testing Strobel's urine, McAlpin informed Strobel that he was going to send in the positive sample and contact Probation and Parole (P&P) and the center's program director, per protocol. At this point, Strobel "became very belligerent and argumentative," claiming it was a

---

[2] Defense counsel initially agreed evidence that the test results were "presumptively positive" could come in but later asked that no testimony be admitted regarding the actual test result. The State agreed. Although the State spoke to its witnesses about this stipulation, McAlpin testified that the UA result was "positive." Defense objected and the court struck the testimony.

"conspiracy" and that McAlpin was "trying to take his freedom." McAlpin testified that Strobel then said that "if he had an effing gun he would be shooting this place up." McAlpin described Strobel at the time as "pulling himself up" to make himself look bigger and having a "confrontational" stature and "markedly louder" tone of voice. He said Strobel repeated his threat about "shooting the place up" as he was leaving.

¶9 Following what he described was the center's "chain of command" protocol, McAlpin emailed the program director and informed center staff about what happened. Strobel's threat caused McAlpin "grave concern." McAlpin took the threat as meant to "either intimidate, coerce, [or] try to have [him] alter [his] protocol," believing Strobel would "retaliat[e]" by either shooting at the building or shooting at individuals inside the building, including McAlpin. He did not know whether Strobel had a gun on him, or one in his vehicle, or whether Strobel would return "in five minutes, ten minutes, half an hour, hour, [or] a day." McAlpin watched the surveillance cameras all day for Strobel to return, fearful for his safety and the safety of the 100-plus pre-release center residents and staff.

¶10 The next morning, McAlpin spoke with Helena Police Officer Nathaniel Weems. Initially, McAlpin testified that he told police he had "grave concerns and apprehension that something was going to happen." Then, after the prosecutor refreshed McAlpin's recollection with a transcript of the call where he purportedly told police he was not fearful, McAlpin clarified that, at the time of the call with police, "the level of threat ha[d] deescalated to a point" where he did not have the same level of fear the next day as he did on the day of the incident.

¶11     On cross-examination, defense counsel homed in on this inconsistency—that McAlpin testified he had "grave concern" but told police he did not have "reasonable apprehension"—and the fact that McAlpin did not immediately call police but rather contacted the pre-release program director by email. Defense also sought to undermine McAlpin's credibility by highlighting that he initially forgot on the witness stand that Strobel had made any threat at all and that he admittedly wanted to give law enforcement "all the ammunition they need[ed]" to prosecute the offense. McAlpin admitted on cross that Strobel only said "if" he had a gun and that Strobel never told him to not send in the UA test.

¶12     Officer Weems testified that he contacted McAlpin and Strobel separately the day after the incident.[3] Once contacted, Strobel admitted "rais[ing] his tone" but denied threatening McAlpin or mentioning a gun. Weems also confirmed that the pre-release center and P&P usually coordinate before involving law enforcement. On cross-examination, defense again homed in on inconsistencies, this time in the officer's report, eliciting testimony that Weems reported McAlpin "feared for his safety" when McAlpin actually told the officer "he did not have reasonable apprehension."

¶13     Strobel's probation officer, McKenzie Lyons, also testified. She learned of the November 9, 2022 pre-release center incident the morning it happened and later told the center to contact law enforcement. On cross-examination, defense counsel explored

---

[3] McAlpin's and Weems' testimony differed slightly as to who called whom. McAlpin said he called police, but Officer Weems said that he called McAlpin.

timelines, eliciting testimony that Lyons told the center to contact police shortly before noon on November 9, even though police were not involved until the next day.

¶14 After close of evidence, the District Court proposed Jury Instruction No. 28, which stated that "evidence of failure to make a timely complaint or immediate outcry does not raise any presumption as to the credibility of the victim," based on extensive cross-examination testimony regarding when police were contacted and became formally involved. Defense counsel objected on the grounds that the instruction "might confuse the jury." Otherwise, there was no defense objection to any other jury instructions as given.

¶15 Next, Strobel made two motions—to dismiss and for a directed verdict of acquittal—based on lack of sufficient evidence to support all elements of intimidation.[4] Specifically, Strobel argued that the State failed to present evidence that he actually threatened McAlpin or intended for his statements to cause McAlpin not to report the positive UA test. The court disagreed and denied both motions. The evening of the one-day trial, the jury returned a verdict of guilty on the offense of intimidation.

**Sentencing on Revocation in DC 2019-172 and on Jury Verdict in DC 2022-577**

¶16 After Strobel's jury conviction, the District Court took judicial notice of the jury verdict and adjudicated Strobel guilty of the non-compliance violation in the State's

---

[4] We refer to Strobel's combined mid-trial motions under § 46-16-403, MCA, collectively here as a motion to dismiss for insufficient evidence. Asking for both a motion to dismiss for insufficient evidence and a motion for a directed verdict of acquittal based on insufficient evidence under § 46-16-203, MCA, is substantively the same thing. *See State v. Lord*, 2025 MT 302, ¶ 1 n.1, 425 Mont. 398, 581 P.3d 392; *State v. Dulaney*, 2025 MT 67, ¶ 48 n.17, 421 Mont. 251, 566 P.3d 534; *State v. Barrows*, 2018 MT 204, ¶ 16, 392 Mont. 358, 424 P.3d 612 ("dismissal of a charge for insufficiency of the evidence is an acquittal").

7

revocation petition. The court then set sentencing on both matters, revocation and jury conviction, for May 2023. Prior to sentencing, the court ordered a presentence investigation report (PSI) which ultimately included three separate evaluations: a June 2019 Neuropsychological Assessment; a March 2023 Mental Health Assessment; and a March 2023 Chemical Dependency Evaluation. Strobel also separately filed these three PSI-included evaluations along with a pro se "postconviction" motion on May 5, 2023, which the District Court dismissed without prejudice as premature because Strobel's conviction was not yet final.

¶17 After hearing McAlpin's impact statement, Probation Officer Lyons' testimony, Strobel's allocution, and the parties' sentencing recommendations, the court (1), in DC 2019-172, revoked Strobel's probationary sentence and resentenced him to a net 5-year term at MSP, no time suspended, with 678 days elapsed-time credit; and (2), in DC 2022-577, sentenced Strobel on the intimidation conviction to a 5-year term at MSP, consecutive to his sentence in DC 2019-172. The court issued conforming written judgments in July 2023.

¶18 Strobel appeals both July 2023 judgments. We will discuss additional facts as needed.

**STANDARD OF REVIEW**

¶19 Each issue discussed below will have a statement of the applicable standard of review.

8

**DISCUSSION**

¶20    *1. Whether the trial court erroneously denied Strobel's motion to dismiss for insufficient evidence.*

¶21    To obtain a conviction on the offense of intimidation as charged and instructed here, the State was required to prove beyond a reasonable doubt that Strobel:

(1)    "with the purpose to cause [McAlpin] . . . to omit the performance of any act,"

(2)    "communicate[d] to [McAlpin] . . . a threat to . . . inflict physical harm on [McAlpin] or any other person," "without lawful authority" to do so,

(3)    "under circumstances that reasonably tend to produce a fear that [the threat] [would] be carried out."

Section 45-5-203(1)(a), MCA.

¶22    A district court properly grants a motion to dismiss for insufficient evidence under § 46-16-403, MCA, when, viewing the evidence in a light most favorable to the prosecution, no evidence exists upon which a rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. *State v. Bomar*, 2008 MT 91, ¶ 13, 342 Mont. 281, 182 P.3d 47.  We review a court's denial of a § 46-16-403 motion to dismiss de novo, applying the same standard as the trial court, because evidence is either sufficient or not. *State v. Dulaney*, 2025 MT 67, ¶¶ 48-49, 421 Mont. 251, 566 P.3d 534; *State v. Swann*, 2007 MT 126, ¶¶ 15-19, 337 Mont. 326, 160 P.3d 511.

¶23    Strobel contends the State did not prove that he intended his statements to cause McAlpin not to report the positive UA, failing the intent element of § 45-5-203(1)(a), MCA.  Instead, he is like the defendant in *State v. Plenty Hawk*, 285 Mont. 183, 948 P.2d 209 (1997), who was only belligerent but with no specific purpose to coerce.  When

9

emergency personnel and law enforcement arrived to find Plenty Hawk lying in the middle of the road intoxicated and covered in mud and blood, Plenty Hawk was "combative and belligerent." Once in custody, Plenty Hawk took a swing at an EMT, challenged an officer to a fight, and threatened to kick the officer's ass and terrorize his family once he got out of jail. *Plenty Hawk*, 285 Mont. at 184-85, 948 P.2d at 209-10. The State later obtained a conviction on the offense of intimidation, which we vacated. Although the State alleged that Plenty Hawk threatened the officer to effect his release from custody, the State presented "no evidence" that Plenty Hawk threatened with any particular purpose and "no evidence" regarding what act Plenty Hawk was seeking to have done or omitted. On the trial evidence, then, Plenty Hawk's drunken threats were only "a continuation of his belligerent attitude," not criminal intimidation. *Plenty Hawk*, 285 Mont. at 186-87, 948 P.2d at 211.

¶24 McAlpin testified that Strobel arrived at the pre-release center, among other things, "combative" and "ready to tussle." But that fact does not negate McAlpin's additional testimony that, after he told Strobel he would report the positive UA to authorities, Strobel "became very belligerent and argumentative," claimed a "conspiracy" to "take his freedom," and twice said in a "markedly louder" tone of voice that "if he had an effing gun he would be shooting this place up." McAlpin also testified that he understood Strobel's threat as an effort to "either intimidate, coerce, [or] try to have [him] alter [his] protocol." More importantly, unlike in *Plenty Hawk*, the State presented evidence from which the jury could identify both the act Strobel sought to prevent and the circumstances supporting that

inference: McAlpin told Strobel he would report the UA result; Strobel immediately escalated from argument to a firearm threat; and Strobel repeated the threat as he left. In context, a rational juror could infer that Strobel made the threat with the purpose to cause McAlpin not to report the positive UA.

¶25 Strobel says no rational juror could infer intent solely from circumstantial evidence of the timing of his remarks. But criminal intent, "rarely susceptible of direct or positive proof," must usually be inferred from circumstantial evidence, including what a defendant says and does and all the facts and circumstances involved. *State v. Motarie*, 2004 MT 285, ¶¶ 7-8, 323 Mont. 304, 100 P.3d 135; *State v. Christensen*, 2020 MT 237, ¶¶ 118, 126, 401 Mont. 247, 472 P.3d 622 (citing § 45-2-103(3), MCA)); *accord State v. Enright*, 1998 MT 322, ¶¶ 35-36, 292 Mont. 204, 974 P.2d 1118 ("circumstantial evidence can be sufficient to prove criminal intent, as well as to sustain a conviction"). Strobel contends the State's case "depended entirely on McAlpin's testimony" and there was "no independent witness corroboration" of McAlpin's version of events. If so, the testimony of one witness is sufficient to prove any fact. Section 26-1-301, MCA; *State v. Merrick*, 2000 MT 124, ¶¶ 13-14, 299 Mont. 472, 2 P.3d 242. Strobel emphasizes that McAlpin's inconsistent statements made him an unreliable witness. If so, the jury was free to assess McAlpin's credibility and give his testimony due weight. *Bomar*, ¶ 23. Strobel claims the trial evidence was "equally consistent with frustration or anger." If so, the jury was free to decide which evidentiary theory was the most reasonable. *Enright*, ¶ 36.

11

¶26 Finally, Strobel's arguments highlight that there were two competing views regarding the evidence presented. That is not the proper circumstance for dismissal or directed verdict of acquittal. The test for dismissal under § 46-16-403, MCA, is that "no evidence exists" upon which a rational juror could find the elements of a crime beyond a reasonable doubt. *Bomar*, ¶ 13; *Plenty Hawk*, 285 Mont. at 186-87, 948 P.2d at 210-11. The specific question at that stage was whether the State had presented any evidence warranting submission of the issue to the jury. *State v. Dellar*, 2025 MT 111, ¶¶ 9-10, 422 Mont. 124, 569 P.3d 534 (distinguishing *Plenty Hawk*); *Motarie*, ¶¶ 7-8 (distinguishing *Plenty Hawk*). Viewing the trial evidence in a light most favorable to the State, a rational juror could have found the State proved the elements of intimidation beyond a reasonable doubt. Strobel was therefore not entitled to dismissal for insufficient evidence, and the District Court correctly denied his motion.

¶27 *2. Whether the trial court erred by instructing the jury that evidence of a victim's failure to make a timely complaint does not raise any presumption as to the victim's credibility.*

¶28 Jury Instruction No. 28 read: "Evidence of failure to make a timely complaint or immediate outcry does not raise any presumption as to the credibility of the victim." This language comes verbatim from § 45-5-511(4), MCA ("provisions generally applicable to sexual crimes"). The court proposed Instruction No. 28 at the close of evidence and before argument. Strobel objected.

¶29 A court enjoys broad discretion when instructing a jury. *State v. Erickson*, 2014 MT 304, ¶ 21, 377 Mont. 84, 338 P.3d 598. The court's discretion, though, is limited by its

12

duty to instruct the jury on every issue or theory finding support in the evidence. *Erickson*, ¶ 35. We therefore review jury instructions to determine whether, taken as a whole, the instructions fully and fairly instruct the jury as to the applicable law and whether the court abused its discretion. *Erickson*, ¶ 21; *State v. Gerstner*, 2009 MT 303, ¶ 15, 353 Mont. 86, 219 P.3d 866. A jury instruction may be given when it is relevant to evidence or issues in a case and supported either by some evidence or some logical inference from other evidence presented at trial. *State v. Johnson*, 1998 MT 289, ¶ 35, 291 Mont. 501, 969 P.2d 925. If the instructions are erroneous in some aspect, the mistake must prejudicially affect the defendant's substantial rights in order to constitute reversible error. *State v. Nick*, 2009 MT 174, ¶ 8, 350 Mont. 533, 208 P.3d 864.

¶30    For the first time on appeal, Strobel frames McAlpin's "delayed complaint" testimony as impeachment evidence. But he expressly disclaimed that theory at trial. From defense closing argument:

> McAlpin did not fear Strobel. He tattled to his manager, then the probation officer told them that he should call the police so [Strobel] could get in trouble. . . . Lyons said she communicated that before 11:30 a.m. the day of the incident, and they said it happened around 10. She said before 11:37 a.m. . . . McAlpin should communicate it to law enforcement.
>
> Well, the next day they decided it was time. . . . [T]he judge instructed you that . . . the timing of the report shouldn't affect the . . . the victim's credibility. *We're not talking about credibility here.* We're talking about what happened. You're allowed to use your common sense. *I'm not saying that because [McAlpin] reported [the incident] later that he's a liar and this statement was never made.* I'm saying that because he reported the next day it didn't seem like it was a true threat. The State's talking about circumstantial evidence and direct evidence. I think that that is *circumstantial evidence that there was no belief it was a true threat and it wasn't presented as a true threat.*

13

[McAlpin] told Officer Weems that he wasn't in fear . . . . He told Officer Weems he wanted to press charges so they could have all the ammunition they needed. Never once did he say he was scared, and I don't think many people would be. . . . Now he has grave concerns and . . . watches his back for something he doesn't remember. *If the circumstances would reasonably cause fear*, wouldn't he have remembered something like that? Maybe he's exaggerating. It sure seems like it to me. So no, *they did not prove the second element* [that McAlpin's fear was reasonable under the circumstances] beyond a reasonable doubt.

(Emphasis added.) In other words, Strobel offered the delayed-reporting evidence to negate the State's proof that he threatened McAlpin under circumstances that would reasonably tend to produce a fear that the threat would be carried out. *See* § 45-5-203(1)(a), MCA. Despite Strobel's claim that Instruction No. 28 prevented his use of delayed-reporting testimony as substantive evidence that McAlpin's fear was unreasonable under the circumstances, he was able to and did argue that theory to the jury.[5]

¶31 Strobel is correct that Instruction No. 28 was drawn verbatim from a statute governing sexual crimes. *See* § 45-5-511(4), MCA; *Gerstner*, ¶¶ 40-43. That origin makes the instruction, at best, an awkward fit here. But we need not decide whether that instruction should generally be given outside the context addressed by § 45-5-511(4), MCA, because the dispositive question is prejudice. *Nick*, ¶ 8. Strobel has not shown that the instruction prevented him from presenting his theory of defense or otherwise

---

[5] Strobel also argues he was entitled to use the delayed-reporting testimony as substantive evidence to negate the State's proof of intent. But whether and when a victim reports the threat, or whether the threat has an actual "coercive effect," is not material to whether the defendant had the requisite mental state in making it. Section 45-5-203(1)(a), MCA. Strobel did not argue this relevance theory at trial.

14

substantially affected his rights. Therefore, he fails to establish reversible error because the instruction was given.

¶32 Strobel further argues that Instruction No. 28 tilted the credibility question in the State's favor. The record does not bear that out. The State addressed McAlpin's prior inconsistent statement on direct examination, and Strobel then cross-examined McAlpin and Officer Weems at length about the delayed report, the absence of an immediate police call, and McAlpin's prior statement that he lacked "reasonable apprehension." Delayed reporting may be relevant in different ways depending on the case. Here, Strobel used the timing evidence not to argue that delay created a legal presumption of falsity, but to argue that McAlpin's actions after the incident undercut the State's proof that the threat had occurred under circumstances reasonably tending to produce fear it would be carried out. The defense was permitted to make that argument fully. The jury heard that McAlpin did not immediately call police, that he first reported the matter through pre-release channels, and that he later told Officer Weems he did not have "reasonable apprehension." The jury also heard defense counsel argue that these facts showed the statement "didn't seem like it was a true threat."

¶33 Even assuming the court should not have imported verbatim a sexual offense instruction into this nonsexual case, Strobel has not shown reversible prejudice. The instruction did not prevent cross-examination, did not prevent impeachment with McAlpin's inconsistent statements, and did not prevent the defense from arguing that McAlpin's delayed reporting undermined the reasonableness of his claimed fear.

Because the jury instructions as a whole fully and fairly instructed the jury on the law and left the credibility determinations to the jury, and because Strobel fully presented his theory, any error in giving Instruction No. 28 was harmless. We therefore affirm on this issue.

¶34 *3. Whether the trial court abused its discretion in controlling the presentation of evidence regarding McAlpin's inconsistent statements.*

¶35 Strobel broadly asserts that the District Court "abused its discretion by admitting evidence through leading questions that violated [his] right to due process and a fair trial." Trial courts have broad discretion when controlling the questioning of witnesses and presentation of evidence. M. R. Evid. 611; §§ 46-16-401, -402, MCA; *State v. Sayler*, 2016 MT 226, ¶ 11, 384 Mont. 497, 380 P.3d 743. A court abuses its discretion if it acts arbitrarily or unreasonably, resulting in substantial injustice. *Sayler*, ¶ 11. Though generally disfavored on direct examination, leading questions may be asked where necessary to develop testimony and whether they are allowed is up to the trial court's discretion. *Sayler*, ¶ 18; M. R. Evid. 611(2)(c). Not every question that could be answered with a "yes" or "no" is a leading question; to be leading, it must be obvious the examiner suggests the answer in the question. *State v. Lindberg*, 2008 MT 389, ¶¶ 45-46, 347 Mont. 76, 196 P.3d 1252; § 26-1-101(3), MCA.[6]

---

[6] The fact that a question "could be answered with a 'yes' or 'no' does not, *ipso facto*, make the question a leading question." Instead, "a question calling for a 'yes' or 'no' answer is a leading question only if, under the circumstances, it is obvious that the examiner is suggesting that the witness answer the question one way only, whether it be 'yes' or 'no.'" *Lindberg*, ¶ 46 (citation omitted).

¶36 Strobel points to several places in the trial record where the court improperly admitted testimony over his objection. In one cited instance, Strobel did not actually object to any testimony. In another cited instance, Strobel objected to what he characterized as a "yes or no question" on leading grounds; the court impliedly sustained by instructing the prosecutor to rephrase, and Strobel did not object again.

¶37 The last cited portion is the State's examination of McAlpin regarding his "level[s] of fear" between the November 9 incident and speaking with Officer Weems the next day.

> Prosecutor: [W]hen you spoke with Officer Weems, did you have the same concern then as you did the day before?
>
> Defense: *Objection, Your Honor, leading.*
>
> Court: *Overruled.*
>
> Prosecutor: So you spoke to the officer about it the next day, is that fair to say?
>
> McAlpin: I explained to him that I had grave concerns and apprehension that something was going to happen.
>
> Prosecutor: So you have the transcript [of the call] in front of you. Do you recall telling Officer Weems that at that point you did not have reasonable apprehension within the day or so after?
>
> McAlpin: He was not there, but I told him I had grave concerns that something could happen.
>
> Prosecutor: Okay, so would you say it lessened to some extent in a day, is that fair to say?
>
> Defense: *Again, leading, Your Honor.*
>
> Court: *Sustained.*

17

Prosecutor: Well, let me just re-ask the question. You're describing being in a small room . . . behind a secure door with Mr. Strobel making these threats about shooting people, okay, right? Is that correct?

McAlpin: That's correct.

Prosecutor: Now at that time you expressed you were fearful, you were scared.

McAlpin: Yes.

Prosecutor: Did you have that same level of fear and being scared when you talked to Officer Weems the next day?

Defense: *Your Honor, I'm going to renew my objection, leading.*

Prosecutor: It's not leading.

Court: *I'll sustain, but he can rephrase.*

Prosecutor: How did you feel when you talked to Mr. Weems?

McAlpin: I told Officer Weems that I had reasonable apprehension and grave concerns that something was going to happen. . . . I had some real . . . I guess I would call it fear. I had a hundred plus people I [was] responsible for.

Prosecutor: [Approaches witness] Do you recall—I'm going to grab the transcript. . . . . [C]an you please read that to yourself? . . . [S]o do you recall having that conversation with Officer Weems within a day or so?

McAlpin: Yes.

Prosecutor: And so what explanation do you have about the day after?

McAlpin: At that particular time the level of threat had deescalated to a point.

Prosecutor: So your fear changed over a period of time. Is that fair to say?

18

| | |
|---|---|
| Defense: | *Objection, Your Honor, leading.* |
| Court: | *Sustained, but he can rephrase.* |
| Prosecutor: | So were you as scared when you talked to Officer Weems, the same level of fear as you were the day of this incident with Mr. Strobel? |
| McAlpin: | No. |
| Defense: | *Objection, Your Honor, move to strike.* |
| Court: | *Overruled.* |

(Emphasis added.)

¶38    This record shows that, of Strobel's five objections, the court sustained three. Instead of arbitrarily allowing evidence in through leading questions, the court exercised balanced judicial control of questioning.  We see no abuse of the court's discretion here.

¶39    As part of his argument that the District Court abused its discretion in controlling the presentation of evidence, Strobel contends the court was complicit in the prosecution's improper "bolstering the explanation of a prior inconsistent statement before impeachment."  In essence, Strobel believes the District Court should not have allowed the State to question McAlpin about his inconsistent statements on direct examination, even though Strobel did not contemporaneously object to any questioning on these grounds.  Presumably, Strobel means for his "leading" objections and motion to strike to encompass this argument.

¶40    But Strobel does not point to any authority for the proposition that the State may not address impeachment evidence on direct examination and instead must wait until rebuttal,

19

after the defendant impeaches the witness on cross-examination. Instead, M. R. Evid. 607 explicitly allows any party to impeach the credibility of a witness, including the party that called the witness. *Accord* Fed. R. Evid. 607 (substantively identical); Commission Comments M. R. Evid. 607 (abolishing common law rule that party cannot impeach its own witness);[7] § 26-1-302 (forms of impeachment evidence, including "inconsistent statements of the witness" and "other evidence contradicting the witness's testimony"). Strobel also does not contend that McAlpin's prior inconsistent statements were inadmissible under the Rules of Evidence.[8] Nor does Strobel show how the State's calling attention to McAlpin's inconsistent statements *bolstered* his credibility.

¶41    Just because the State's preemptively addressing McAlpin's inconsistent statements undermined the force of that evidence when Strobel got to it on cross-examination, it does not follow that the State's questioning was improper under the rules or that the court abused its discretion. *See, e.g.*, *United States v. Sumlin*, 956 F.3d 879, 890 (6th Cir. 2020) (Fed. R. Evid. 607 "permits a party to proactively introduce potential impeachment evidence during direct examination prior to the defense having the opportunity to present the same evidence during cross-examination").[9] Strobel has failed to show that the District Court abused its discretion in controlling the presentation of evidence.

---

[7] *Accord* Commission Comments M. R. Evid. 611.

[8] *See, e.g.*, M. R. Evid. 801(d)(1)(A) (declarant's prior inconsistent statement not definitional hearsay when the declarant "testifies at the trial or hearing and is subject to cross-examination concerning the statement"); § 26-1-302, MCA (forms of impeachment evidence).

[9] "By exposing the impeachment evidence herself, the party calling a witness can portray that evidence in a way far different from the way it might be portrayed if it was first revealed by the

¶42    *4. Whether Strobel has shown reversible plain error based on his unpreserved claims of erroneous admission of propensity evidence, jury instruction error, or prosecutorial misconduct.*

¶43    Strobel raises several claims of error that he did not contemporaneously object to at trial but says were reversible plain error. The common law plain error doctrine is a narrow exception to the rule that failure to preserve an assertion of error generally waives the right to later appellate review. *City of Missoula v. Charlie*, 2025 MT 85, ¶¶ 13, 17-18, 421 Mont. 403, 567 P.3d 922. We invoke this doctrine sparingly and only when firmly convinced that the alleged error affected a fundamental constitutional right and failure to review and correct it would result in a manifest miscarriage of justice or otherwise undermine the fundamental fairness of the proceedings. *Charlie*, ¶ 18.

**Admission of Propensity Evidence**

¶44    Strobel claims the District Court committed reversible plain error in allowing the State to present propensity evidence under M. R. Evid. 404 without considering its prejudicial impact under M. R. Evid. 403. Although he cites dozens of pages of trial transcript, Strobel only specifically identifies a few examples of alleged propensity evidence.[10] We are not obligated to make Strobel's argument for him or search pages of

---

adversary. If the witness being impeached is favorable to the party calling her, the impeachment can be accomplished in a manner to reduce its sting. If the witness is unfavorable, the impeachment can be more successful because the adversary was not able to first shape the witness's testimony in anticipation of that attack." *State v. Swift*, 955 N.W.2d 876, 891 (Iowa 2021) (McDonald, J., specially concurring) (citing 27 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6093 (Scope of Fed. R. Evid. 607) (2d ed. 2007)).

[10] Some of Strobel's citations are to the prosecutor's opening statement and closing argument, neither of which were evidence. Sometimes, Strobel cites to portions of transcript that do not exist.

transcript to identify specific offending testimony where Strobel has not. *See, e.g., State v. Kearney*, 2005 MT 171, ¶ 16, 327 Mont. 485, 115 P.3d 214. In seeking plain error review, Strobel bears the burden to firmly convince this Court he is entitled. *Charlie*, ¶ 18. Therefore, we address only the specific examples he provides.

¶45 First, Strobel cursorily asserts that his probation status was inadmissible other-acts evidence under M. R. Evid. 404(b). But Strobel, through counsel, stipulated to testimony about his probation status "for context" to explain his presence at the pre-release center and as evidence of motive and opportunity, all non-propensity purposes under Rule 404(b).[11] Strobel cannot now complain that this evidence was inadmissible. *State v. Kaarma*, 2017 MT 24, ¶ 51, 386 Mont. 243, 390 P.3d 609.

¶46 Next, Strobel takes issue with McAlpin's testimony that: (1) Strobel was "agitated" when he arrived at the pre-release center; (2) McAlpin's law enforcement background gave him experience in dealing with all types of people; (3) Strobel's threat to shoot up the pre-release center made McAlpin fearful for the 100-plus people in the building; and (4) McAlpin considered "a threat of violence to our community or to a building or facility with a number of people in it . . . a horror." This is not improper propensity evidence. *See* M. R. Evid. 404(a), (b) (character and other-acts evidence not admissible for the purpose of proving "action in conformity therewith"). First, none of this testimony

---

He also cites, inexplicably, to testimony *he* elicited on cross-examination as improper propensity evidence.

[11] Strobel also points to McAlpin's testimony that the UA was "positive." But the court struck that testimony on Strobel's objection. *Supra*, note 2.

qualifies as "other acts." Second, character evidence regards "a person's general personality traits or propensities" and is synonymous with their "morality," which is "the sum total of all a person's moral traits, including honesty, fidelity, peacefulness, etc." *State v. Pelletier*, 2020 MT 249, ¶ 15, 401 Mont. 454, 473 P.3d 991 (citations omitted). Appearing "agitated" is evidence of a particular state of being, not a character trait. Contrary to Strobel's assertions, McAlpin's testimony was not improper evidence of Strobel's character or propensity for violence.

¶47 Finally, Strobel cites to *all* of Probation Officer Lyons' testimony, asserting she "portrayed Strobel as a flawed individual in need of being hunted down" and "depict[ed] him as a dangerous fugitive." This is a fantastic characterization of Lyons' testimony and Strobel does not point to a single statement that would support it. Accordingly, Strobel's claim that the court admitted impermissible propensity evidence through Lyons' testimony has no merit.

¶48 In sum, the evidence Strobel points to was not improper propensity evidence. A defendant's threshold burden when seeking plain error review "is to demonstrate that there was an error at trial." *State v. Birthmark*, 2013 MT 86, ¶ 11, 369 Mont. 413, 300 P.3d 1140. Strobel has not shown plain error on this issue.

**Jury Instruction No. 26**

¶49 Strobel contends that Jury Instruction No. 26, a unanimity instruction, was an "unnecessary inclusion" that "likely confused" the jury of the differences between "acts" and "elements," thereby freeing the State of its burden of proof. Strobel speculates that,

23

because the jury returned a "rapid verdict" the same day of his one-day trial, they must have convicted him only upon proof of "a single act" instead of "all four elements" of intimidation based on this instruction.

¶50 Instruction No. 26 was the MCJI pattern unanimity instruction for continuous conduct, requiring the jury to unanimously agree as to the conduct constituting the charged offense. The jury was instructed on the offense of intimidation, its four separate elements, and that it must find the State proved all four elements beyond a reasonable doubt. Strobel did not object to and instead acquiesced in the instruction he now calls error. We have previously concluded that the instructions as a whole fully and fairly instructed the jury on the law, *supra*. Therefore, we are not firmly convinced Instruction No. 26 left the jury with any prejudicial misunderstanding of the law resulting in a fundamentally unfair proceeding or manifest miscarriage of justice. *See State v. Marfuta*, 2024 MT 245, ¶¶ 40-44, 418 Mont. 353, 557 P.3d 1260; *State v. Dethman*, 2010 MT 268, ¶¶ 32-33, 358 Mont. 384, 245 P.3d 30. Strobel has not shown plain error on this issue.

**Prosecutorial Misconduct**

¶51 Strobel asserts about a dozen instances of prosecutorial misconduct, none of which he objected to at trial, again citing dozens of pages of trial transcript but not identifying any specific prosecutor statements. We may dispose of several of his allegations, having already decided that the State did not improperly impeach its own witness or elicit propensity evidence, *supra*.[12] What's left then, in summary, are allegations that the

---

[12] Among other things, Strobel contends the prosecutor "expressed negative comments about Strobel's character," but, again, Strobel cites to entire pages of transcript, so it is unclear what

prosecutor: (1) appealed to law and order and questioned Strobel's right to silence; (2) misrepresented the law to the jury by conflating elements of the offense and engaged in burden-shifting; and (3) lied and cited evidence not in the record as fact.

¶52 We invoke plain error review only where the cumulative effects of prosecutorial misconduct leave unsettled the question of fundamental fairness. *State v. Aker*, 2013 MT 253, ¶¶ 21, 24, 28-31, 371 Mont. 491, 310 P.3d 506; *State v. Miller*, 2022 MT 92, ¶¶ 36-38, 408 Mont. 316, 510 P.3d 17. We do not consider prosecutor statements in isolation, but rather, in context of the entire trial record. *Aker*, ¶¶ 24, 30; *Miller*, ¶¶ 36-38. "A prosecutor's argument is not plain error if made in the context of discussing the evidence presented and how it should be used to evaluate a witness's testimony under the principles set forth in the jury instructions." *Aker*, ¶ 27. "Although a prosecutor must avoid offering personal opinion, comment is appropriate on the gravity of the crime charged, the volume of evidence, credibility of witnesses, inferences to be drawn from various phases of evidence, and legal principles involved in the instructions to the jury." *Aker*, ¶ 27.

¶53 With these principles in mind, we conclude that Strobel has not shown plain error. As for the prosecutor's "appeal to law and order," Strobel objected and the court sustained. As for the prosecutor "questioning Strobel's right to silence," the record reflects only that

_____

prosecutor statements he is referring to. In the cited pages for this specific claim, we could find no prosecutor comment on Strobel's character. Strobel also alleges very generally that the prosecutor "bolstered and vouched for the State's witnesses," citing 14 pages of transcript but, again, no specific prosecutor statements. Reviewing these pages as a whole, we find no evidence of the prosecutor's bolstering or vouching for any witness's credibility.

the prosecutor restated Officer Weems' testimony that, when interviewed, Strobel denied making any threats or mentioning guns. As for the prosecutor "engaging in burden shifting," the record shows that, on redirect of Officer Weems, the prosecutor inquired if the officer's report and body camera footage was made available to the defense. As for the prosecutor's "conflating" and "melding" the elements of intimidation, the record reflects that, while his argument style was more fluid, the prosecutor clearly separately argued the reasonableness of McAlpin's fear under the circumstances and Strobel's purpose for making the threat as separate elements of intimidation. As for the prosecutor's making "inflammatory false statements of fact" and stating facts not in evidence, the only statements we could find in the cited pages that would arguably qualify were the prosecutor's saying Strobel "stormed out" of the center "screaming about shooting people." McAlpin testified that Strobel spoke in a "markedly louder" tone and that he escorted Strobel out; he did not say Strobel was screaming or stormed out.

¶54 While not perfect, in context of the entire trial proceeding, the prosecutor's conduct did not rise to the level of affecting fundamental fairness. The only conduct that could be considered improper—eliciting testimony that the defense had evidence it did not present and mischaracterizing one piece of witness testimony in closing argument—was not so prejudicial as to create a manifest miscarriage of justice entitling Strobel to a new trial. We hold that Strobel has not shown reversible plain error on this issue or any other unpreserved assertion of error.

26

¶55    *5. Whether Strobel's attorneys were constitutionally ineffective.*

¶56    Strobel contends that his trial counsel and sentencing counsel were constitutionally ineffective.[13]  To be entitled to a new trial, Strobel must show that counsel's performance was deficient and that, but for counsel's deficient performance, the outcome of trial or sentencing would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687-91, 104 S. Ct. 2052, 2064-66 (1984).  We presume that counsel's conduct was reasonable if within prevailing professional norms.  *Strickland*, 466 U.S. at 687-91, 104 S. Ct. at 2064-66.  As a general rule, we review only record-based ineffective assistance of counsel (IAC) claims on direct appeal.  *Rose v. State*, 2013 MT 161, ¶ 18, 370 Mont. 398, 304 P.3d 387; *State v. Kougl*, 2004 MT 243, ¶ 15, 323 Mont. 6, 97 P.3d 1095.

¶57    Strobel asserts three bases for IAC, which we address in turn.

**Counsel's Failure to Object to Propensity Evidence**

¶58    As with his prosecutorial misconduct claim, we may dispose of Strobel's claim that trial counsel was constitutionally ineffective for failing to object to admission of M. R. Evid. 404 propensity evidence because we have previously decided that the State did not elicit any improper propensity evidence, *supra*.

**Counsel's "Admission of Strobel's Guilt"**

¶59    Strobel next asserts that, as in *State v. Jefferson*, 2003 MT 90, 315 Mont. 146, 69 P.3d 641, his trial counsel "effectively admitted" his guilt.  During opening statement, defense counsel stated:

---

[13] Strobel was represented by different counsel at sentencing than at trial.

> When Curt McAlpin told [Strobel] the test would be sent to probation, [Strobel] was upset and he began protesting and saying he felt that he wasn't getting a fair shake. *Frustrated, he throws up his arms and says, if I had a gun I[] would shoot you all,* and storms out of the testing center. . . . Words are important.

Then, in closing argument, counsel said:

> [M]y whole theme for this trial was words are important. And you're hearing the prosecutor and other people mischaracterize what my client said. He didn't say I'm going to shoot. *He said if I had a gun, I would shoot everyone*, as he was leaving. So please remember that that's what the testimony was. Those are the facts. Don't let anybody convince you that [Strobel] said I'm going to because that's not in evidence. . . . I want to make sure that that is emphasized.

(Emphasis added.) This is a record-based IAC claim and we may review it.

¶60 In *Jefferson*, counsel was constitutionally ineffective because he admitted that his client was "guilty, no doubt," of felony assault and there was "no doubt that [he] assaulted" his girlfriend with a weapon. *Jefferson*, ¶¶ 45-46. Even on a silent record, there was no plausible justification for these statements because, prior to trial, the defendant specifically withdrew from a plea agreement in order to proceed to trial. The defendant

> wanted the opportunity to be acquitted, or to be convicted of a less serious offense than felony assault. However, at trial, counsel admitted guilt to felony assault during the opening and closing statements and undermined the very purpose for which Jefferson withdrew from the plea agreement. His remarks had the effect of entering a plea for Jefferson without his consent and by which the jury was not bound.

*Jefferson*, ¶¶ 50-57 (admitting his client's guilt undermined the entire purpose of foregoing a plea deal and was thus prejudicial under *Strickland*).

¶61 We are not convinced that Strobel's counsel's strategy to confront and frame the evidence fell outside the bounds of professional norms. The jury heard direct testimony

28

that Strobel twice said, "if he had an effing gun he would be shooting this place up." McAlpin's testimony was controverted only by Officer Weems' testimony that Strobel denied the allegations when questioned by police. Throughout trial, including jury instruction, defense counsel framed Strobel's comments as conditional and not meant as a "true threat" in an effort to create doubt that Strobel committed the requisite act and had the requisite mental state for the offense.[14] This was clearly a deliberate choice with a plausible strategic justification, placing counsel's conduct outside *Jefferson*. Strobel has not shown that his trial counsel's performance fell below an objective standard of reasonableness under the circumstances. *See Hammer v. State*, 2008 MT 342, ¶ 10, 346 Mont. 279, 194 P.3d 699 (a defendant who fails either *Strickland* prong fails to show IAC).

**Counsels' Failure to Address Strobel's Mental Condition**

¶62 The issue of Strobel's mental condition came up twice during proceedings: during voir dire when defense counsel said the case involved someone with a TBI, and at sentencing, when Strobel informed the court that his TBI interfered with his ability to understand the sentencing proceedings.

¶63 When the State objected to defense counsel's mentioning the TBI during voir dire for lack of any notice of a mental-defect defense, counsel confirmed they were not raising a mental disease or disorder defense at trial. Though Strobel's argument on this issue is

---

[14] Defense counsel asked for and obtained jury instruction on intimidation's "true threat" requirement, an instruction he crafted from *State v. Ross*, 269 Mont. 347, 889 P.2d 161 (1995).

convoluted, he essentially says counsel was ineffective for failing to obtain a mental health evaluation or assert a mental-defect defense. The record indicates that counsel did obtain a "Mental Health Assessment" in March 2023 ahead of the May 2023 sentencing. However, trial counsel's rationale for not asserting a mental-defect defense is not of-record in this case. It is therefore not a record-based IAC claim amenable to review on direct appeal. Strobel is free to raise the issue in postconviction proceedings.[15]

¶64    At sentencing, when asked by the court if he was suffering from a mental condition that interfered with his ability to understand the proceedings, Strobel answered in the affirmative. He explained that he had "brain damage" in the form of a TBI and "problems sometimes with understanding the question." The court also noted that, in his premature pro se "postconviction" motion, Strobel asserted IAC on the grounds that his trial counsel had not appropriately addressed his mental condition. The sentencing court therefore noted and discussed its obligations under § 46-14-311, MCA, when a defendant's mental condition is at issue at sentencing.

¶65    Accordingly, there was significant discussion regarding Strobel's mental condition, which we conclude provides a sufficient record to review and consider Strobel's sentencing counsel IAC claim. Counsel's responses, however, centered largely on whether Strobel was *fit to proceed with sentencing*. That is not the pertinent inquiry under § 46-14-311, MCA, which, at the sentencing phase, deals exclusively with whether a defendant's mental

---

[15] Strobel has a head start on this process, having already filed a pro se motion for "postconviction" relief in which he asserted, among other things, that his trial counsel was ineffective for failing to seek any "accommodation" for his "mental handicap." The District Court dismissed this motion without prejudice as untimely because filed before sentencing.

condition rendered him incapable of appreciating the criminality of his conduct or conforming his conduct to the law *at the time of the offense*. Section 46-14-311(1), MCA; *see also* § 46-14-312, MCA (how § 46-14-311 affects sentencing). When asked by the sentencing court if § 46-14-311, MCA, was at issue, Strobel's counsel answered:

> From my interactions with Mr. Strobel and the bar being so high for someone not to be *fit to proceed*, I didn't see any concern.

¶66 Strobel contends his sentencing counsel was ineffective for failing to "adequately discuss the court's concern about [his] TBI mental defect." The record shows some level of misunderstanding on counsel's part regarding the pertinent sentencing inquiry under § 46-14-311, MCA. However, even if counsel's failure to appreciate the distinction between a "fitness to proceed" inquiry and the sentencing inquiry under § 46-14-311(1) was deficient performance,[16] Strobel has not shown how, but for counsel's error, the result of the sentencing proceeding would have been different. *See Hammer*, ¶ 10. Notwithstanding counsel's shortcomings, the sentencing court took up the issue sua sponte based on Strobel's pre-sentencing "postconviction" allegations and statements about his TBI at sentencing. Conscientious of its obligation under § 46-14-311, MCA, the court noted it had "thoroughly reviewed" and considered the PSI, all incorporated mental health evaluations, and other "relevant evidence," including the trial testimony and Probation

---

[16] *See* §§ 46-14-101, -103, -202, -204, -205, -206, -221, -222, MCA; *see also State v. Korell*, 213 Mont. 316, 322-23, 690 P.2d 992, 996 (1984) (discussing the three distinct phases where a defendant's mental condition is relevant: fitness to proceed and be prosecuted; as trial evidence negating mental state; and the effect of ability to appreciate criminality of conduct at sentencing).

31

Officer Lyons' testimony at sentencing,[17] and it sentenced Strobel accordingly. Strobel has not shown that, had counsel articulated a more precise argument, the sentencing outcome would have been different.

¶67 In sum, we hold that Strobel has failed to show his counsel were constitutionally ineffective on his record-based claims. His trial counsel IAC claim for failure to raise a mental-defect defense is not record-based and we therefore decline to address it on direct appeal without prejudice to Strobel's raising it through a timely petition for postconviction relief.

¶68 *6. Whether Strobel has shown cumulative error warranting reversal.*

¶69 Strobel contends that the cumulative effect of preserved errors, unpreserved errors, and ineffective assistance of counsel created intolerable prejudice, warranting reversal and a new trial. The cumulative effect of errors "will rarely merit reversal," but "where numerous errors, when taken together, have prejudiced the defendant's right to a fair trial," the cumulative error doctrine "mandates reversal." *State v. Cunningham*, 2018 MT 56, ¶¶ 32-33, 390 Mont. 408, 414 P.3d 289; *State v. Novak*, 2005 MT 94, ¶ 35, 326 Mont. 485, 111 P.3d 199.

¶70 For all the reasons stated above, there was no prejudicial error at Strobel's trial, much less cumulative prejudicial error. Strobel is not entitled to a new trial.

---

[17] Probation Officer Lyons testified as to the content of the mental health evaluations included in the PSI, including Strobel's self-reported TBI. She noted that the examining psychologist described "mild to moderate memory impairment but superior prefrontal cortex functioning and an average IQ."

¶71    *7. Whether the sentencing court erroneously denied credit for elapsed time without a documented violation.*

¶72    Finally, Strobel contends that, when sentencing him on revocation in DC 2019-172, the District Court erroneously awarded him only 678 days of elapsed-time credit.

¶73    Section 46-18-203(7)(b), MCA (2023), governs elapsed-time credit on revocation. The statute requires the sentencing court to consider elapsed time, consult the records and recollection of the probation and parole officer, and allow credit for elapsed time served without any record or recollection of violations. *State v. Gudmundsen*, 2022 MT 178, ¶ 8, 410 Mont. 67, 517 P.3d 146. "Violations may be continuous or ongoing, so long as the record or recollection of the supervising probation or parole officer points to specific, actual instances of offender conduct constituting a violation of the terms of a sentence." *State v. Powell*, 2025 MT 218, ¶ 14, 424 Mont. 180, 577 P.3d 150. Because credit for elapsed time is mandatory to the extent required by statute, we review a court's determination regarding elapsed-time credit for legality. *Gudmundsen*, ¶ 8.

¶74    In her November 2022 Record of Violations (ROV), Probation Officer Lyons calculated 546 days of elapsed-time credit based on the periods for which she had no record or recollection of violations; she further stated that Strobel "spent the remainder" of his probationary sentence "in violation," including by repeatedly not reporting to probation and providing positive UAs. Lyons identified numerous specific violations and noted that Strobel was subject to enhanced requirements for prolonged periods as sanctions for

condition violations.[18] Lyons testified at sentencing in conformance with her ROV. According to Lyons' recollection, Strobel was entitled to 546 days for the following periods without reported violations:

- 11/27/2019 through 7/28/2020 (245 days)

- 3/22/2021 through 6/14/2021 (85 days)

- 10/4/2021 through 11/15/2021 (43 days)

- 1/27/2022 through 7/18/2022 (173 days)

¶75 On cross-examination, Lyons conceded Strobel was entitled to an additional 50 days for a period of no violations from February 1 through March 22, 2021. In argument at sentencing, defense counsel convinced the District Court that Strobel was entitled to an additional 82 days for a period of no violations from April 27 through July 18, 2022. The District Court then awarded Strobel a total of 678 days elapsed-time credit (546 + 50 + 82). On this record, the court did what § 46-18-203(7)(b), MCA (2023), requires: it consulted the probation officer's records and recollection, considered the evidence and argument presented at sentencing, and awarded credit for periods the court accepted as violation-free. Strobel has not shown that the resulting award of 678 days was illegal. The District Court's calculation of elapsed-time credit is affirmed.

---

[18] At least one of Strobel's calculated periods of time with "no violations" was during a 30-day September 2022 sanction period.

**CONCLUSION**

¶76 We hold that Strobel was not entitled to mid-trial dismissal under § 46-16-403, MCA, for insufficient evidence. We further hold that no preserved instructional or evidentiary issue warrants reversal; that Strobel has not shown reversible plain error on any unpreserved claims; that his record-based IAC claims fail on direct appeal; and that he has not shown cumulative error. Finally, Strobel has not shown that the District Court's award of 678 days of elapsed-time credit under § 46-18-203(7)(b), MCA (2023), was illegal.

¶77 Strobel's July 2023 sentence on jury verdict in DC 2022-577 and sentence on revocation in DC 2019-172 are affirmed.

/S/ KATHERINE M. BIDEGARAY

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON